# Richmond

ATLANTIC GREYHOUND LINES, A VIRGINIA CORPORATION, V.
CLIFF R. SKINNER, ADM'R, ETC.

April 10, 1939.

Record No. 2018.

Present, All the Justices.

The opinion states the case.

*Leith S. Bremner, Thomas O. Moss* and *Robert Lewis Young,* for the plaintiff in error.

*Emanuel Emroch, B. Harrison Turnbull* and *Hugh A. Locke,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This action was instituted to recover damages for the wrongful death of J. P. Hamilton, who was killed while a passenger on a bus operated by the Atlantic Greyhound Lines from Bristol, Tennessee, through Virginia, to Washington, D. C. The trial resulted in a verdict for $7,500 on

which judgment was entered. Defendant in the trial court sought and obtained this writ of error, which brings the proceedings before this court for review.

While there are other assignments of error, the two major questions presented are: (1) Whether Hamilton was a passenger for hire at the time he was killed, and (2) whether the evidence, as a matter of law, convicts the defendant carrier of gross, wanton or wilful negligence.

The Southeastern Greyhound Lines, another separate and independent interstate carrier of passengers, acquired in Philadelphia six new buses to be used by it on routes running out of Birmingham, Alabama. In June, 1936, this carrier applied to and received from defendant carrier six one-way passes over its lines from Bristol, Tenn., to Washington, D. C., to be used by the six bus drivers whom the Southeastern Greyhound Lines expected to send from Birmingham to Philadelphia for the new buses. J. P. Hamilton, one of the six employees of the Southeastern Greyhound Lines *en route* to Philadelphia on this mission, was killed when one of defendant's buses ran off the highway and turned over near Natural Bridge.

When Hamilton entered the bus of the defendant carrier at Bristol, he offered for passage one of these six passes. His name was signed to the following stipulations and condition printed on the back: "In consideration of the issue of this free ticket, I hereby assume all risk of accident and injury and expressly agree that Atlantic Greyhound Lines, Greyhound Lines, and/or associated companies, or any other person, firm or corporation, operating its lines, or over or upon the same, shall not be liable, under any circumstances, to me, or persons claiming under or through me, whether occasioned by negligence of its agents or employees or otherwise, for injury to me, or loss or damage to my property or property in my possession, and further agree that as to transportation under this ticket, said company shall not be regarded as a common carrier, either of passengers or goods. I further warrant that I am qualified to accept this ticket, and that I will not use same in violation

of the State or Federal laws. I further agree not to use this free ticket to the exclusion of fare-paying passengers. If presented by anyone other than myself said company may take up and cancel this ticket, and collect full fare. By my signature hereon I accept the foregoing conditions and adopt the statements therein contained."

When these stipulations and conditions were offered in defense of the action, the trial court held them void and submitted the case to the jury on the theory that Hamilton was a passenger for hire, and entitled to that high degree of care which a common carrier owes to such pasengers.

It is conceded that J. P. Hamilton was on an interstate journey at the time of the accident, hence the validity of the conditions on the pass must be determined solely by Federal law. *Williamson* v. *Seaboard Air Line Ry.*, 136 Va. 626, 118 S. E. 255; *McGuire* v. *Atlantic Coast Line R. Co.*, 136 Va. 382, 118 S. E. 225; *Manieri* v. *Seaboard Air Line Ry. Co.*, 147 Va. 415, 137 S. E. 496; and *Southern Ry. Co.* v. *Wilmouth*, 154 Va. 582, 153 S. E. 874.

The 1935 National Motor Carrier Act, part 2, sec. 217 (b), 49 U. S. C. A., sec. 317 (b), provides as follows: "No common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation or for any sevice in connection therewith between the points enumerated in such tariff than the rates, fares and charges specified in the tariffs in effect at the time; and no such carrier shall refund or remit in any manner or by any device, directly or indirectly, or through any agent or broker or otherwise, any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities for transportation in interstate or foreign commerce except such as are specified in its tariffs: *Provided,* That the provisions of section 1 (7) and 22 (1) of this title shall apply to common carriers by motor vehicles subject to this chapter."

The reference to other sections in the above statute is to the Interstate Commerce Act, U. S. C. A., Title 49, originally known as the Hepburn Act, adopted June 29, 1906. Prior

to the adoption of this act by Congress, the United States Supreme Court had declared that it was contrary to sound public policy to permit a common carrier to stipulate for exemption from liability for the negligence of itself or its servants; that the rule applied both to the carriers of goods and the carriers of passengers for hire, "and with especial force to the latter;" and that a passenger traveling on a pass given for the purpose of taking care of livestock on the train was a passenger for hire. *New York Central R. Co.* v. *Lockwood,* 17 Wall. 357, 21 L. Ed. 627; *Liverpool & Great Western Steam Co.* v. *Phenix Insurance Co.,* 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788. This rule of public policy did not include a passenger to whom transportation was gratuitously furnished. As to such a passenger, such stipulations against negligence were valid. *Northern Pacific Ry. Co.* v. *Adams,* 192 U. S. 440, 24 S. Ct. 408, 48 L. Ed. 513; *Boering* v. *Chesapeake Beach Ry. Co.,* 193 U. S. 442, 24 S. Ct. 515, 48 L. Ed. 742. In *Grand Trunk Ry. Co.* v. *Stevens,* 95 U. S. 655, 24 L. Ed. 535, it was held that a person traveling on a pass and making the journey for the mutual interests of the carrier and himself was a passenger for hire.

These principles were firmly established prior to June, 1906, when the Hepburn Act was adopted, the pertinent parts of which act, as amended, now provide: "No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees and their families, its officers, agents, surgeons, physicians, and attorneys at law; * * * ; to necessary caretakers of livestock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; * * * ; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, * * * : *Provided,* That this provision shall not be construed to prohibit *the interchange of passes for the officers, agents, and employees of common carriers,* and their families; * * * : *And provided further,* That this provision shall not

be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employees, and their families of such telegraph, telephone and cable lines, and the officers, agents, employees and their families of other common carriers subject to the provisions of this chapter: * * * . Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty." (Italics supplied.) 49 U. S. C. A., sec. 1 (7).

This act, as applied to the question of transportation on a pass given to the wife of an employee who was injured on an interstate journey, was first construed in *Charleston & Western Carolina Ry. Co.* v. *Thompson,* 234 U. S. 576, 34 S. Ct. 964, 965, 58 L. Ed. 1476. In an opinion delivered by Mr. Justice Holmes, this was said: "The main question is whether when the statute permits the issue of a 'free pass' to its employes and their families it means what it says. The railroad was under no obligation to issue the pass. It may be doubted whether it could have entered into one, for then the services would be the consideration for the duty and the pass and by section 6 [49 U. S. C. A., sec. 6] it was forbidden to charge 'a greater or less or different compensation' for transportation of passengers from that in its published rates. The antithesis in the statute is between the reasonable charges to be shown in its schedules and the free passes which it may issue only to those specified in the act. To most of those enumerated the free pass obviously would be gratuitous in the strictest sense, and when all that may receive them are grouped in a single exception we think it plain that the statute contemplates the pass as gratuitous in the same sense to all. It follows, or rather is saying the same thing in other words, that even on the improbable speculation that the possibility of getting an occasional free pass entered into the motives of the employee in working

.for the road, the law did not contemplate his work as a conventional inducement for the pass but on the contrary contemplated the pass as being what it called itself, free."

It would seem, from the broad language used, that the Supreme Court, in 1914, was of opinion that all persons who were permitted by the act to receive passes should be regarded as free passengers, on the transportation of whom the carrier had a right to limit its common law liability. However, in *Norfolk Southern R. Co.* v. *Chatman*, 244 U. S. 276, 37 S. Ct. 499, 501, 61 L. Ed. 1131, L. R. A. 1917F, 1128, it was held that it was not contrary to the provisions of the Hepburn Act to hold that a caretaker of livestock, to whom a pass had been given for the purpose of looking after stock shipped, was a passenger for hire. The Supreme Court, speaking through Mr. Justice Clarke, said: "The *Lockwood Case* shows that livestock contracts such as we have here, providing for the transportation of caretakers of stock on free passes, were in use by carriers as early as 1859 (17 Wall. 357, 365 [21 L. Ed. 627]), and that they have continued in use up to this time is apparent from the decisions hereinbefore cited, from the case at bar and from many recently reported cases. *Tripp* v. *Michigan Central R. Co.*, 238 F. 449. Notwithstanding the fact, as we have seen, that such transportation has been declared by a long line of decisions not to be 'free' in the popular sense, but to be transportation for hire, with all of the legal incidents of paid transportation, the carriers of the country have continued to issue it and to designate it as 'free.'

"With this legal and commercial history before us we must conclude that the destination 'free pass,' as applied to transportation issued or given by railroad companies to shippers and caretakers of stock, had acquired a definite and well known meaning, sanctioned by the decisions of this court and widely by the decisions of the courts of the various States, long prior to the enactment of June 29, 1906, and that, therefore, Congress must be presumed to have used the designation 'free pass' in the sense given to it by this judicial determination when, in section 1 of that

act, by specific exception, it permitted the continuance of the then long established custom of issuing free transportation or passes to shippers or caretakers of live stock. *Kepner* v. *United States,* 195 U. S. 100, 24 S. Ct. 797, 49 L. Ed. 114, 1 Ann. Cas. 655; *Lawder* v. *Stone,* 187 U. S. 281, 293, 23 S. Ct. 79, 47 L. Ed. 178, 183; Sutherland on Statutory Construction, section 333.

"It results that the 'settled rule of policy' established by the *Lockwood Case,* and the decisions following it, must be considered unmodified by the Act to Regulate Commerce, that the plaintiff in charge of his stock, traveling upon a pass permitted to be issued by that act, was a passenger for hire, and that defendant's first claim must therefore be denied."

The only other case, in which the question of passes was discussed by the Supreme Court, was *Kansas City Southern Ry. Co.* v. *Van Zant,* 260 U. S. 459, 43 S. Ct. 176, 67 L. Ed. 348, which held that the Hepburn Act controlled the issuance of free transportation to parties using it for interstate journeys, that stipulations thereon limiting the liability of the carrier were valid notwithstanding the fact that such stipulations were held void in the State where the accident occurred, and that the case was controlled by the holding in *Charleston & Western Carolina Ry. Co.* v. *Thompson, supra.*

The conclusion from these decisions seems to be that whether a person within the permitted class, who is traveling on an interstate journey, shall be deemed a passenger for hire depends on whether the carrier receives compensation for the transportation.

The uncontradicted evidence in the case at bar is that the Southeastern Greyhound Lines applied to, and received from defendant six one-way passes for use of its employees to make an interstate journey for its benefit. There was no agreement between the carriers to furnish each other free transportation for any purpose. Neither carrier was under any contractual obligation or legal duty to furnish free transportation to employees of the other. They were

accustomed to furnish such transportation as a matter of courtesy. In extending this courtesy no distinction is, or was, made between passes to be used by employees and members of their families making a journey on missions of their own, or passes to be used by such employees making a journey for the benefit of their employer. The form of the pass and the stipulations against liability were the same in either event. While the evidence shows that the Southeastern Greyhound Lines had issued passes for use by defendant carrier's employees, it does not show that these passes had ever been used for the benefit of defendant carrier. There is no evidence tending to show that the defendant carrier had, or contemplated having any business which would necessitate its sending its officers, agents or employees over the lines of the other carrier. The defendant carrier received no compensation from Hamilton. The alleged benefit to defendant is based solely upon the mere possibility that sometime in the future its corporate business might necessitate the use of transportation by its employees over the lines of the other carrier. Such a consideration or possible benefit is too vague, uncertain and indefinite to constitute Hamilton a passenger for hire.

The facts in the case at bar are distinguishable from those in *Grand Trunk R. Co.* v. *Stevens, supra.* In that case the defendant carrier requested Stevens to go to Montreal at its expense to consult the superintendent of defendant railway at its car department shop about a patent coupling in which both parties were interested. Pursuant to this arrangement Stevens was given a pass, from Portland to Montreal, containing a stipulation exempting the carrier from liability for negligence. While on the journey Stevens was injured and instituted action to recover damages. The court held that "the transportation of the plaintiff in the defendant's cars, though not paid for by him in money, was not a matter of charity nor of gratuity in any sense. It was by virtue of an agreement, in which the mutual interest of the parties was consulted." [95 U. S. 658.]

Plaintiff also relies upon *Virginia Beach Bus Line* v. *Campbell,* 73 F. (2d) 97. The facts in that case were that plaintiff, whose hotel at Hertford, N. C., was used as a passenger station or bus stop by the bus company, gave general information to the public concerning the baggage, schedule and fares of the buses and their arrival and departure. For this service she received a free pass over its lines, and was injured while traveling on an interstate journey by means of this pass. The Circuit Court of Appeals for the Fourth Circuit held that the Virginia Beach Bus Line was guilty of wilful negligence which was the proximate cause of Mrs. Campbell's injuries. While not pertinent, it was said that Mrs. Campbell was a passenger for hire. Of course she was. She paid in service rendered for the right to be transported on missions of her own over the bus lines of defendant. Whether she or the carrier was liable for the penalties provided for breach of the provisions of the Hepburn Act was not pertinent in a controversy between private parties. See another phase of this case decided by the Supreme Court of North Carolina in *Campbell* v. *American Fidelity & Casualty Co.,* 212 N. C. 65, 192 S. E. 906.

Plaintiff's contention—that the custom of interchanging passes for use by employees of the carriers constituted sufficient consideration to make the users passengers for hire— was made in *Fort Wayne & Wabash Valley Traction Co.* v. *Justus,* 186 Ind. 464, 115 N. E. 585. It appeared in that case that Justus, as director of the Marion, Bluffton & Eastern Traction Company, had been given an annual pass over the lines of the Ft. Wayne & Wabash Valley Traction Company with the usual stipulations exempting the carrier from negligence. While using this pass for transportation over the latter lines he was killed. In an action by his administrator, the stipulations on the pass were offered in defense. The construction of a State statute similar to the Hepburn Act governed the decision. The Indiana court based its decision mainly upon the statement of Mr. Justice Holmes in the *Thompson Case, supra,* but made no refer-

ence either to the *Stevens Case* or the *Chatman Case*. The opinion does not state whether Justus, at the time of his death, was on a personal mission or on a mission for his corporation.

In *Dunn* v. *Alton R. Co.* (Mo. App.), 88 S. W. (2d) 224, 226, plaintiff, an employee of another carrier, brought action to recover for personal injuries sustained while going to and from his work. The defendant relied upon stipulations on the back of the pass to relieve it from ordinary negligence of its servants. Plaintiff contended that defendant carrier received consideration for honoring his pass, in that passes issued by the employer of plaintiff were in turn honored by defendant, "and that, consequently, by virtue of such reciprocal arrangement between the several companies, the condition printed on the back of his pass to the effect that by his acceptance and use of it he assumed all risk of injury was not valid and binding upon plaintiff." It appeared in the evidence that the use of the pass was for the benefit of plaintiff, and not for the benefit of his employer or the defendant carrier. The court, in disposing of the contention, said: "Rather, it appears that the pass was issued to plaintiff simply as a courtesy to which he was lawfully entitled as a railroad employee, and pursuant to a custom, though not an agreement, between carriers to issue passes to each other's employees upon a proper request therefor from the employing carrier, which passes, when once issued and accepted by the employees, were just as much available to them for use for purposes of pleasure or for matters purely personal as if and when used to secure transportation to or from the point where a run might either begin or terminate."

So in the case at bar the defendant carrier was not interested in the party who might be benefited by use of the pass. If it had been for the pleasure or business of the employees of the other carrier, the pass would have been issued and the same consideration, if there be consideration, would have been received.

In *Bowman* v. *Pennsylvania R. Co.*, 299 Pa. 558, 149 A. 877, certiorari denied in 282 U. S. 849, 51 S. Ct. 27, 75 L. Ed. 752, it appeared that Bowman, as a general agent of the Erie Railroad Company, was given a pass over the Pennsylvania Railway, and, while traveling on this pass containing stipulations against negligence similar to those now under consideration, Bowman was killed. In an action brought by the administrator for wrongful death, the court held that Bowman was on an interstate journey traveling on a free pass.

The question in *Baltimore & Ohio S. W. Ry. Co.* v. *Voigt*, 176 U. S. 498, 20 S. Ct. 385, 387, 44 L. Ed. 560, was whether similar stipulations against negligence of the carrier were valid as applied to an employee of an express company injured in an express car transported by the Baltimore & Ohio Railway. In holding the stipulations valid, the court said: "The principles declared in those cases are salutary, and we have no disposition to depart from them. At the same time it must not be forgotten that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare. It was well said by Sir George Jessel, M. R., in *Printing & N. Registering Co.* v. *Sampson*, L. R. 19 Eq. 465: 'It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.'"

While we have cited some cases decided by State courts, the question is controlled solely by the views of the Federal court. It is true that the broad statement in the *Thompson Case, supra,* was modified in the *Chatman Case, supra,* to the extent of holding that a pass given to a person to care for livestock and other freight in transit was not a gratuity although called a free pass. In this opinion, emphasis is placed on the "settled rule of policy" established by decisions prior to 1906. So far as any policy, as to the use of passes by the employees of one carrier over the lines of another, is concerned, it would seem to be settled against the contention of plaintiff by decisions rendered prior and subsequent to the Hepburn Act.

The pertinent facts in *Northern Pacific Ry. Co.* v. *Adams,* 192 U. S. 440, 24 S. Ct. 408, 410, 48 L. Ed. 513, were that Adams was employed as an attorney by several carriers and was killed while riding on a pass over the lines of the Northern Pacific Railway Company, though not employed by that company. The court stated the issue thus: "Is the company responsible for injuries resulting from ordinary negligence to an individual whom it permits to ride without charge on condition that he take all the risks of such negligence?"

Mr. Justice Brewer, speaking for the court, after citing the *Voigt Case, supra,* said: "The railway company was not as to Adams a carrier for hire. It waived its right as a common carrier to exact compensation. It offered him the privilege of riding in its coaches without charge if he would assume the risks of negligence. He was not in the power of the company and obliged to accept its terms. They stood on an equal footing. If he had desired to hold it to its common law obligations to him as a passenger, he could have paid his fare and compelled the company to receive and carry him. He freely and voluntarily chose to accept the privilege offered, and having accepted that privilege cannot repudiate the conditions. It was not a benevolent association, but doing a railroad business for profit; and free passengers are not so many as to induce negligence on

its part. So far as the element of contract controls, it was a contract which neither party was bound to enter into, and yet one which each was at liberty to make, and no public policy was violated thereby."

In *Boering* v. *Chesapeake Beach Ry. Co.,* 193 U. S. 442, 24 S. Ct. 515, 516, 48 L. Ed. 742, the stipulations on a free pass were held valid, although the user was not aware of the conditions. The court stated: "A carrier is not bound, any more than any other owner of property who grants a privilege, to hunt the party to whom the privilege is given, and see that all the conditions attached to it are made known."

In the stipulation signed by Hamilton, among other things he agreed; (1) That, as to transportation upon this free ticket, the company should not be regarded as a common carrier of passengers, (2) that he would not use the ticket to the exclusion of fare-paying passengers, and (3) that he waived any right to hold the company responsible for negligence of its officers, agents or employees. The evidence shows that the same stipulations were contained on any pass issued by defendant, whether the user expected or intended to use it for his own business or for the business of any other party.

The last expression on the point by the Supreme Court of the United States, to which our attention has been called, is in *Kansas City Southern Ry. Co.* v. *Van Zant*, 260 U. S. 459, 43 S. Ct. 176, 177, 67 L. Ed. 348, in which this is said: "The provision for passes, with its sanction in penalties, is a regulation of interstate commerce, to the completion of which the determination of the effect of the passes is necessary. We think, therefore, free passes in their entirety are taken charge of, not only their permission and use, but the limitations and conditions upon their use; or to put it another way, and to specialize, the relation of their users to the railroad which issued them, the fact and measure of responsibility the railroad incurs by their issue, and the extent of the right the person to whom issued acquires, are taken charge of. *And that responsibility and those*

*rights, this court has decided, the railroad company can control by conditions in the passes. Antecedently to the passage of the Hepburn Act, we decided that a passenger who accepts a free pass may exempt a carrier from responsibility for negligence, and no public policy is violated thereby. Northern Pacific Railway Co. v. Adams, 192 U. S. 440, 24 S. Ct. 408, 48 L. Ed. 513; Boering v. Chesapeake Beach Railway Co., 193 U. S. 442, 24 S. Ct. 515, 48 L. Ed. 742.*

"Those cases were considered and applied as giving validity to the stipulations of passes issued under the act in *Charleston & Western Carolina Railway Co.* v. *Thompson,* 234 U. S. 576, 34 S. Ct. 964, 58 L. Ed. 1476, according thereby freedom of transportation to the possessor of a pass, and giving assurance to the railroad company that its gratuity will not be given the consequences of compensated right and its incident obligations, and be a means of exacting from the company indefinite damages. In this case the prayer was for $25,000; the recovery was for $8,000. Circumstances might have made it the larger sum; and this, it is the contention and decision, is the determination of state laws which could neither permit nor forbid the gift. We cannot assent. The pass proceeded from the federal act; it is controlled necessarily in its incidents and consequences by the federal act, to the exclusion of state laws and state policies, and such is the effect of the cited cases." (Italics supplied.)

The Hepburn Act requires common carriers to charge for the transportation of passengers neither more or less than the rate published in its schedule. It permits carriers to interchange passes for use by persons within the classes named. The Supreme Court has held that the railway company has the right to fix its responsibilty for the transportation of such persons by conditions attached to the passes. If the user elects to accept free transportation with conditions annexed, what rule of public policy will be violated by holding such stipulations valid? The defendant carrier gave the pass as a gratuity. It was accepted and used by Hamilton with full knowledge of conditions and stipulations attached. Having exercised the privilege extended,

neither Hamilton nor those claiming through him should be permitted to enjoy the benefits of the privilege, and reject the burdens which were imposed as an integral part of the class of transportation furnished. The officers, agents or employees of other carriers are not forced to accept free transportation over the lines of another carrier. This is true regardless for whose benefit the journey is made. If they desire to hold the common carrier to its common law obligation, they are at liberty to deal with it as any other member of the general public.

Defendant received no more, nor less, consideration than it would have received if Hamilton had used the pass for his own pleasure. The Supreme Court emphatically stated that such consideration is not sufficient to make the passage one for hire. If the consideration is not sufficient in one case, the same consideration could not be held sufficient in the other.

Plaintiff further contends that even if it is held that the transportation furnished Hamilton was in the nature of a gratuity, still he is entitled to recover because the evidence conclusively convicts defendant of gross and wanton negligence. Defendant concedes that, if its gross or wanton negligence was the proximate cause of Hamilton's death, it is liable in this action, but it contends that on the degree of negligence there is a sharp conflict in the evidence. These contentions compel us to briefly review the evidence on the subject.

The evidence for plaintiff tends to prove that the accident occurred on highway No. 11 just south of Natural Bridge. Approaching the bridge from the south there is a 1,100-foot incline leading to the crest of the hill, then the highway extends down approximately a 6 percent decline some 1,400 feet to the bridge. The hard surface is some twenty feet wide, with dirt shoulders 10 feet wide on either side. 900 feet from the crest there is a sharp 20 percent curve to the left. The hard surface in the curve is some 23 feet wide and banks 2½ inches from left to right. On the right of the curve is a steel guard rail 12 inches in width

extending the length of the curve. This rail is fastened to posts 8 inches in diameter embedded 3 feet in the ground and placed 16 feet apart. There are 4 warning signs erected immediately to the right of the dirt shoulder between the crest of the hill and the curve. The headlights of a car traveling north clearly reveal these signs to the driver. The first sign is some 400 feet from the top of the hill and reads "SLOW." The second sign is some 100 to 150 feet further down and reads "HILL SHIFT GEARS." The third sign is 150 feet further and reads "SPEED LIMIT 25 MILES." The fourth sign is placed just within the curve and consists of a large square with black stripes on a yellow background, and extending diagonally across its center was a reflector type arrow pointing left, indicating danger.

On the night of June 30, 1936, which was dark and rainy, defendant's bus, traveling on this highway *en route* to Washington, left Roanoke some 45 minutes late. The bus driver stated to some friends in Roanoke that he would arrive in Washington on schedule time. As he drove through the town of Buchanan, some 25 or 26 miles from Roanoke, the bus skidded on the slick road, which caused one or more passengers to become frightened. The bus was driven up the long incline and over the crest of the hill at a speed in excess of 45 miles per hour. The driver apparently gave no heed to the four warning signs and lost control of the bus as it began to skid from one side of the road to the other. It finally left the highway to the right, crossed the dirt shoulder, struck the 12-inch guard rail and uprooted 5 of the posts to which it was attached, plunged down a 6-foot embankment, and came to rest lying on its top with the wheels in the air. The driver of defendant's bus and four passengers, including plaintiff's decedent, were killed. Of the other 33 passengers, seven were injured and over twenty were given first aid.

The evidence for defendant is quite different. It tends to show that, while the bus left Roanoke some 20 minutes late, it consumed an hour and ten minutes making the 38-mile trip from Roanoke to the scene of the accident. Dur-

ing the entire 38 miles, the bus was driven very carefully with no untoward incidents. In going up the 1,100-foot incline, the driver shifted from high to one of the intermediate gears and reached the crest of the hill traveling at less than 20 miles per hour. The same rate of speed was maintained down the incline. Some 300 or more feet from the sharp curve the wheels of the bus ran over a thin coating of water, mud and slime which the recent rains had washed upon the hard surface. Thereupon his rear wheels began to skid. The driver, exercising care, was successful in pulling the bus out of this skid. Immediately thereafter the wheels ran over another abnormally slick place upon the hard surface. This caused another skid, carrying the bus against the guard rail and over the 6-foot embankment. Several passengers on the bus, called as witnesses for defendant, stated that the driver "handled the bus perfectly up until the accident," and that, as the bus began to skid, he did "all he could in his power to hold it in the road."

██ On this conflict in the evidence the jury might have found that defendant was guilty of gross or wanton negligence, or it might have found that defendant was guilty of nothing more than ordinary negligence. In the one case the defendant would have been liable to plaintiff, and in the other it would not have been liable.

For the reasons stated, the judgment of the trial court must be reversed, the verdict of the jury set aside, and the case remanded for a new trial in accordance with the views herein expressed.

*Reversed and remanded.*

HOLT, J., dissenting.

The tendency to accentuate matters which support conclusions reached and to minimize others seems to be inescapable, but this persisting angle of approach is not apt to be hurtful when we come to deal with verdicts affirmed, for under a long settled rule, where matters are in dispute, we accept as proven those which sustain them when supported by credible evidence.

Cliff R. Skinner, as administrator of the estate of J. P. Hamilton, deceased, brought this action against the Atlantic Greyhound Lines—hereinafter for brevity sometimes called the Atlantic—to recover damages for the death of Hamilton, who, while a passenger on a bus operated by the defendant, was one of five persons killed when the bus ran off the highway at a curve near Natural Bridge, was precipitated down an embankment and turned over. The jury rendered a verdict in favor of the plaintiff for $7,500, and a judgment in that sum was entered against the defendant. The case comes here on a writ of error.

Hamilton was riding on a pass; and, while there are seven assignments of error, the one of most importance, and the one upon which the arguments of counsel for the respective sides largely center, is the fourth. In that assignment it is charged that the trial court erred in overruling the defendant's motion to strike out and exclude from the consideration of the jury all of the evidence introduced on behalf of the plaintiff. The general question of law presented by that assignment is aptly stated by counsel for the defendant in these words:

"Were the conditions set forth in the pass for an interstate journey upon which the plaintiff's intestate was riding at the time of his death valid and binding?"

The decedent, Hamilton, thirty years of age, was a bus driver in the employ of another carrier, the Southeastern Greyhound Lines, hereinafter sometimes called the Southeastern. That company had bought six new buses in Philadelphia, to be used by it on routes running out of Birmingham, Alabama. The buses being ready for delivery, in June, 1936, the Southeastern applied to the Atlantic for six one-way passes from Bristol, Virginia (or Tennessee), to Washington, D. C., for six of its drivers, whom it was about to send to Philadelphia for the new buses. The passes were promptly sent to the Southeastern. On the back of the pass was printed the following:

"Conditions."

"In consideration of the issue of this free ticket, I hereby assume all risk of accident and injury and expressly agree that. Atlantic Greyhound Lines, Greyhound Lines, and/or associated companies, or any other person, firm or corporation, operating its lines, or over or upon the same, shall not be liable, under any circumstances, to me, or persons claiming under or through me, whether occasioned by negligence of its agents or employees or otherwise, for injury to me, or loss or damage to my property or property in my possession, and further agree that as to transportation under this ticket, said company shall not be regarded as a common carrier, either of passengers or goods.

"I further warrant that I am qualified to accept this ticket, and that I will not use same in violation of the State or Federal laws. I further agree not to use this free ticket to the exclusion of fare-paying passengers. If presented by any one other than myself, said company may take up and cancel this ticket, and collect full fare. By my signature hereon, I accept the foregoing condition and adopt the statements therein contained."

Hamilton signed the above just before boarding the defendant's bus at Bristol. The trial court, however, held the stipulations unavailable as a defense to this action, and submitted the case to the jury with instructions predicated upon the theory that Hamilton was an ordinary passenger for hire.

While the plaintiff derives his right to sue from the law of Virginia (Code, sec. 5786), *Northern Pacific Ry. Co.* v. *Adams,* 192 U. S. 440, 448, 24 S. Ct. 408, 48 L. Ed. 513, yet as his intestate was an interstate passenger of an interstate carrier, and Congress has legislated upon the subject of passes issued to such passengers, the main question here involved must be determined in the way Federal law appears to require. *Williamson* v. *Seaboard Air Line Ry.,* 136 Va. 626, 118 S. E. 255; *Southern Ry.* v. *Wilmouth,* 154 Va. 582,

153 S. E. 874; and *Kansas City Southern Ry. Co.* v. *Van Zant,* 260 U. S. 459, 43 S. Ct. 176, 67 L. Ed. 348.

Both the Atlantic and the Southeastern were interstate common carriers and subject to the provisions of the amendment to the Interstate Commerce Act known as Motor Carrier Act, 1935. Section 217(b) of the latter (49 U. S. C. A., sec. 317(b)) provides:

"No common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation or for any service in connection therewith between the points enumerated in such tariff than the rates, fares, and charges specified in the tariffs in effect at the time; and no such carrier shall refund or remit in any manner or by any device, directly or indirectly, or through any agent or broker or otherwise, any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities for transportation in interstate or foreign commerce except such as are specified in its tariffs: *Provided,* That the provisions of sections 1(7) and 22(1) of part I [this title] shall apply to common carriers by motor vehicles subject to this part [chapter]."

The sections referred to in the above proviso are portions of the amendment to the Interstate Commerce Act known as the Hepburn Act, approved June 29, 1906. So much of section 1(7), as amended, of the latter act (49 U. S. C. A., sec. 1(7)), as is here pertinent reads:

"No common carrier subject to the provisons of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees and their families, its officers, agents, surgeons, physicians, and attorneys at law; * * * to necessary caretakers of livestock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; * * * ; to newsboys on trains, baggage agents * * * : *Provided,* That this provision shall not be construed to prohibit the *interchange of passes for the officers, agents, and employees of common carriers,* and their families; * * * . Any common

carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty. * * * " (Italics supplied.)

U. S. C., Title 49, sec. 1(7), 49 U. S. C. A., sec. 1(7).

The provisions of the other section referred to in the proviso, sec. 22(1), in so far as they have a bearing upon the present question, are in substance the same as those of section 1(7), above quoted.

At a relatively early date in the history of transportation law in this country it was held by the Supreme Court of the United States that a pass does not in and of itself import that the user of it is a non-paying passenger and the carrier therefore relieved as to him of its ordinary duty and liability as a common carrier for hire. It was so decided in *New York Central R. Co.* v. *Lockwood,* 17 Wall. 357, 359, 21 L. Ed. 627, where a shipper of cattle who went along as caretaker was injured through the negligence of the carrier. He had been furnished a pass containing conditions purporting to exempt the railroad from all liability for any injury he might sustain on the journey. There, as in the instant case, the traveller had signed the conditions. Under the facts the court treated as obvious the proposition that, despite the form of the caretaker's evidence of right to ride on the train, his passage nevertheless was not gratuitous. It said:

"It may be assumed *in limine,* that the case was one of carriage for hire; for though the pass certifies that the plaintiff was entitled to pass free, yet his passage was one of the mutual terms of the arrangement for carrying his cattle. The question is, therefore, distinctly raised, whether a railroad company carrying passengers for hire, can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage."

The remainder of Mr. Justice Bradley's extended opinion is devoted to a full discussion of the question stated, the conclusion reached being that the carrier could not lawfully so stipulate.

The same view was taken and enunciated by the court in *Grand Trunk R. Co.* v. *Stevens*, 95 U. S. 655, 660, 24 L. Ed. 535. In that case the plaintiff owned a patented car coupler. He and the defendant carrier were in negotiations looking to the use of the invention by the latter. In that connection the plaintiff, at the request and expense of the carrier, proceeded to a point on its road to see one of its officers regarding the matter. A pass, with exempting conditions printed on the back, was furnished the plaintiff for use on the trip. He was injured as the result of the negligently defective condition of the rails. In holding the carrier liable, the court said:

"But we have already shown that the carrying of the plaintiff from Portland to Montreal was not a mere gratuity. To call it such would be repugnant to the essential character of the whole transaction. There was a consideration for it both good and valuable. It necessarily follows, therefore, that it was a carrying for hire. Being such, it was not competent for the defendant, as a common carrier, to stipulate for the immunity expressed on the back of the pass."

In *Gleeson* v. *Virginia Midland R. Co.*, 140 U. S. 435, 11 S. Ct. 859, 35 L. Ed. 458, a postal railway clerk also was assumed to be a passenger for hire and held entitled to recover damages for injuries, notwithstanding the fact that he paid no fare. The carrier, though, seems to have rested its defense solely upon the alleged grounds that the landslide which caused the accident was an act of God, and that the risk was incident to the plaintiff's employment.

On the other hand, in *Baltimore & Ohio S. W. Ry. Co.* v. *Voigt*, 176 U. S. 498, 20 S. Ct. 385, 387, 44 L. Ed. 560, the court, while stating that the *Lockwood Case, supra,* "has been frequently followed, and it may be regarded as establishing a settled rule of policy," yet held that an express

messenger was not a passenger for hire within the doctrine of that case, or, indeed, a passenger at all, but an employee. This because, in the view of the court, the contract between the express company and the railroad—a term of which called for the carriage of the messenger free of charge and exempted the railroad from liability for any injury he might suffer, and which agreement the messenger had on his own behalf ratified—virtually constituted the messenger an employee of both companies, and recovery for his injuries was precluded by the fellow-servant rule. The court said:

"The relation of an express messenger to the transportation company, in cases like the present one, seems to us to more nearly resemble that of an employee than that of a passenger. * * * And, of course, if his position was that of a common employee of both companies, he could not recover for injuries caused, as would appear to have been the present case, by the negligence of fellow-servants."

In *Northern Pacific Ry. Co.* v. *Adams,* 192 U. S. 440, 24 S. Ct. 408, 411, 48 L. Ed. 513, it was held that a lawyer, who, as attorney for other railroads had been furnished a pass by the Northern Pacific, and who at the time of the fatal accident apparently was making a trip on his own personal account, was not a passenger for hire. The court, while expressly referring in its opinion to the *Lockwood* and *Stevens Cases, supra,* regarded the case then in hand as being ruled by its decision in *Baltimore & Ohio S. W. Ry. Co.* v. *Voigt, supra,* saying:

"In the light of this decision but one answer can be made to the question. The railway company was not as to Adams a carrier for hire. It waived its right as a common carrier to exact compensation. It offered him the privilege of riding in its coaches without charge if he would assume the risks of negligence. He was not in the power of the company and obliged to accept its terms. They stood on an equal footing."

Two of the justices dissented.

The same conclusion was reached in *Boering* v. *Chesapeake Beach Ry. Co.,* 193 U. S. 442, 24 S. Ct. 515, 48 L.

Ed. 742, where the plaintiff was the wife of a man who, for some undisclosed reason, had obtained passes for himself and her. It appeared that the trial court had submitted to the jury the question as to whether the plaintiff was, in fact, a free passenger. The jury having rendered a general verdict in favor of the defendant, the court held that the question thereby was answered in the negative.

The foregoing cases were decided prior to the passage of the Hepburn Act of June 29, 1906.

*Charleston & W. C. Ry. Co.* v. *Thompson,* 234 U. S. 576, 34 S. Ct. 964, 965, 58 L. Ed. 1476, was decided after the passage of that act. It was there held that the wife of an employee of the railroad which isued the pass upon which she was traveling was not a passenger for hire and hence could not recover for injuries. In the course of the opinion Mr. Justice Holmes, who delivered it, referring to the exception in the Hepburn Act, stated:

"To most of those enumerated the free pass obviously would be gratuitous in the strictest sense, and when all that may receive them are grouped in a single exception we think it plain that the statute contemplates the pass as gratuitous in the same sense to all."

This, as it appears to us, is to be regarded as a statement *arguendo* rather than as a definite holding that the statute must be so construed. We perceive, however, the legal propriety of a broad generalization in this connection, but, as we view the statute, the generalization should be to the opposite effect, namely, that *none* of the persons to whom passes are allowed to be issued is, in contemplation of law, a gratuitous passenger either in the strictest, or in any legal, sense. Legally speaking, the issuance is never a "courtesy," pure and simple, but always a compensated act.

The theory underlying all cases in which passes are authorized is that an equivalent is rendered by the recipient or user in one form or another, either directly or indirectly. Only upon such hypothesis can the provisions allowing the issuance be brought into harmony with the fundamental policy of equality, which policy is clearly manifested in the

very section under discussion and also in numerous other provisions of the act. In fact, it was the violation of that basic principle, more than any other reason, which led to the original passage, in 1887, of the Act to Regulate Commerce. This appears unmistakably from the report of the Senate Committee submitting the bill. The committee said:

"The provisions of the bill are based upon the theory that the paramount evil chargeable against the operation of the transportation system of the United States, as now conducted, is unjust discrimination between persons, places, commodities, or particular descriptions of traffic."

The exception allowing the issuance of passes derives its justification largely from the fact that it applies in the main to those persons who have an actual part in the conduct of the transportation business of the country, and therefore constitute a legitimate separate class of travelers.

However, assuming for the present that the theory just suggested is not tenable, and that the correct one is that some passes allowed by the exception are gratuitous while others are not, we are unable to agree with the statement of the learned justice that "To most of those enumerated the free pass obviously would be gratuitous in the strictest sense."

It does not appear obvious, at least to us, that the carriage of officers, employees, sleeping car conductors and porter, newsboys, express messengers and caretakers is gratuitous "in the strictest sense," or, indeed, in any true sense. And since, as a matter of fact and common knowledge, they comprise much the largest proportion of those affected by the exception, it would seem that, if an undiscriminating criterion is to be applied in construing its provisions, those classes, and not members of employees' families and others having no direct connection with the transportation service, should be taken as the determining factor. Certainly there is a quasi privity in the case of the first class that does not exist as to the second. Moreover, it is easily conceivable that the exception might have been limited in express terms to officers and employees, but hardly that it

might have been made to apply exclusively to their families and others occupying no, or only a remote, relationship to the carrying enterprise. Furthermore, it is, of course, not permissible, under the theory at present under discussion, to treat the various classes of persons designated in the exception as occupying the same level respecting the question of whether the pass was issued for a consideration or was truly gratuitous. To deal with the subject in any such undiscriminating way would be to go counter to the very principle upon which the court proceeded in *New York Central R. Co.* v. *Lockwood, supra,* and other cases.

In *Norfolk Southern R. Co.* v. *Chatman,* 244 U. S. 276, 37 S. Ct. 499, 61 L. Ed. 1131, L. R. A. 1917F, 1128, the court, disregarding the sweeping dictum of Mr. Justice Holmes in *Charleston & W. C. Ry. Co.* v. *Thompson, supra,* to the effect that the mere fact of being enumerated in the same exception indicated that the various classes to whom passes were allowed to be issued were regarded as absolutely free passengers, and expressly reaffirming the rule in the *Lockwood Case, supra,* held that one who had made a trip on a "drover's pass" was a passenger for hire, and that the carrier was liable accordingly. A contention that the passage of the Hepburn Act had operated to change the law in such cases was definitely rejected by the court.

In *Kansas City Southern Ry. Co.* v. *Van Zant,* 260 U. S. 459, 43 S. Ct. 176, 178, 67 L. Ed. 348, the plaintiff sustained injuries in Missouri while traveling on a pass from Kansas to Oklahoma. The pass had been issued to her as the mother of one of the railroad company's employees. It was held that the plaintiff was not a passenger for hire and hence that the carrier was not liable. It was urged with much earnestness in the plaintiff's behalf that as the accident occurred in Missouri the case was governed by the law of that State, but the court declined to so view the matter and ruled that, having been issued under authority of a Federal statute, the pass was controlled "in its incidents and consequences by the federal act to the exclusion of state laws and policies."

From the foregoing review of decisions rendered by the Supreme Court of the United States the following propositions of law would seem clearly to be established:

1. That a pass issued by a common carrier, although it may contain an express recital to the effect that the user is carried free, and also a stipulation for the carrier's exemption from liability for injuries caused by its negligence, is not conclusive either as to the recital or as to the stipulation, but that the facts may be shown and the law applied accordingly.

2. That where it is shown that the carriage of the passenger was not in fact and in law gratuitous, the carrier rests under the duty and liability of a common carrier for hire, notwithstanding any stipulation purporting to relieve it of such duty and liability.

There emerges, therefore, the pivotal question of whether, as to Hamilton, the Atlantic Greyhound Lines was a common carrier for hire.

The facts bearing upon that question are few, simple and undisputed. They have been stated already and need not be repeated. A brief recapitulation, however, of the cases reviewed in which the carrier was exonerated will, we think, serve as a helpful background to the consideration and decision of the question here presented. In the first of those cases the person involved was an express messenger, who was held barred of recovery because of the fellow-servant rule; in the second he was a lawyer for other railroads but at the time apparently was making a trip for his own account; in the third she was the wife of a man who apparently had no carrier connection whatever; in the fourth she was the wife of an employee of the issuing carrier; and in the fifth she was the mother of an employee of the issuing carrier.

It is to be noted that in none of those cases was the injured person an officer or employee either of the carrier issuing the pass or of another carrier and bound on a journey in his company's service. Those differences, it seems to us, while not controlling, have a material bearing upon

the question of whether there was a consideration for the carriage of Hamilton. This because the latter, as an employee of the Southeastern, may, in this connection, be identified with that company, whereas one who was not in its employ could not be, at least not in the same degree of reality. Besides, Hamilton, identified with the Southeastern, was in a position to serve the Atlantic, should, for instance, the relative positions of Olderson and himself be reversed on some subsequent trip.

The pass upon which Hamilton was riding was issued under that provision of the Hepburn Act which authorized "the interchange of passes for officers, agents and employees of common carriers, and their families." The provision being purely permissive and in no sense mandatory, the carrier is not compelled to issue a pass, and, presumably, does so only where it has already been the beneficiary of a similar act or in such cases as may seem to promise a like return. The very word "interchange," in the statute, implies reciprocity, and reciprocity involves consideration—in the present connection, one carrier issuing passes to another in consideration of reciprocal action, past, present or future, on the part of that other. No carrier would likely honor a request by another for a pass for one of its employees except upon the basis of such an understanding. It is somewhat in the nature of a clearing-house arrangement.

Except for the signing of the stipulation on the back of the pass, the transaction was one wholly between the two carriers. Hamilton did not apply for the pass. That was done by his company. In fact all six of the passes were, at the request of the Southeastern, issued in blank as to the names of the drivers who were to use them, all in accordance with a "common practice" and on "account" of the Southeastern company.

Hamilton, who was traveling on his master's business, accepted the transportation which his master furnished him, as he had to do, and signed the release which he did sign all under compulsion. These acts can only be regarded ·as having been performed under "duress of circumstances,"

to use an apt phrase taken from the opinion of the court in *Baltimore & Ohio S. W. Ry. Co.* v. *Voigt, supra.* Hamilton was in no position to demand that his employer pay his fare in cash. Such a demand, aside from being probably without precedent, doubtless would have cost him his job. It would reflect no credit upon either the philosophy or the ethics of the law to hold that the arrangement respecting the pass, which arrangement was one entirely between the two carriers and, presumably, for their mutual benefit, and to which Hamilton himself, bound on a mission for his employer, really was no party and for which he received no benefit, nevertheless operated to divest him of what otherwise would have been his rights as a passenger.

Hence, the premises considered, we conclude that, upon either of the two theories of construction discussed in this opinion, the defendant, Atlantic Greyhound Lines, was as to the plaintiff's intestate, Hamilton, a common carrier for hire.

It is contended by the defendant that the trial court erred in overruling its motion to reject the plaintiff's replication. The grounds of the motion were that the pleading alleged gross negligence, whereas the motion for judgment had charged only ordinary negligence; that this was a departure, and that as more than a year had elapsed since the accident, the cause of action alleged in the replication was barred by limitation.

The motion for judgment stands or falls upon the facts therein stated. Nothing is gained by the warmth of adjectives employed or by their omission. When these facts warrant a recovery, it is not necessary to charge negligence in terms at all. Moreover, that done which in certain circumstances would be simple negligence may in others become gross.

"These trucks, sometimes inordinate in size, measurably monopolize our highways and add to the peril of their use, and it is in the light of their potential destructiveness that a high degree of care is but ordinary care." *Aronovitch* v. *Ayres,* 169 Va. 308, 193 S. E. 524, 526.

As we have seen, if there was any consideration given for the ticket on which Hamilton traveled, it is plain that he was not a gratuitous passenger.

The defendant also moved the trial court to set aside the verdict of the jury as being contrary to the law and the evidence and to enter judgment for the defendant. The overruling of that motion is also assigned as error. Certain specific assignments based upon the rulings of the trial court in the matter of admitting evidence will be considered in connection with this general assignment.

It is charged by the plaintiff (a) that the bus was at the time of the accident being driven at a dangerous rate of speed, (b) that the driver negligently failed to heed the warning signs placed along the highway, (c) that the driver was not competent for such a responsibility as the defendant had laid upon him, and that the death of plaintiff's intestate was the proximate result of those causes.

From the evidence it appears that the accident occurred on highway No. 11, at a point just south of Natural Bridge, at about 11:30 o'clock on the night of June 30, 1936. Approaching Natural Bridge from the south is an incline of 1,100 feet leading to the crest of the hill, and the road then continues down a 6% decline for about 1,200 feet. The hard surface was 20 feet wide, with dirt shoulders 10 feet wide on either side. There was a slight curve to the left at the top of the hill, and then about 900 feet further down there was a sharp 20-degree curve to the left. It was at that curve the fatal accident occurred, resulting in the death of the driver and four of the 33 passengers and injuries to 20 of the remainder. The hard surface part of the road in the curve was approximately 23 feet wide and banked 2½ feet from left to right. On the right of the curve was a steel plate guard rail 12 inches in width and extending the length of the curve, approximately 225 feet. This rail was secured to posts 8 inches in diameter, set 3 feet in the ground, and placed 16 feet apart, with panels between them.

There were four warning signs standing just to the right of the dirt shoulder between the crest of the hill and the curve. They were placed approximately 100 feet apart. The first read "slow," was of reflector type, and was about 100 feet southwardly from the 20-degree curve. The second read "Hill—Shift Gears," the third "Speed Limit 25 Miles," and the fourth consisted of a 4 x 3 foot striped sign with a reflector arrow across it indicating the direction of the curve. The reflector signs could be seen at a distance of about 500 feet and the others at about 300 feet on a night such as the one in question. Olderson had driven over the route sixteen times or more and was familiar with it.

Due to the fact that on the night of the accident the bus from Bristol was late in arriving at Roanoke, the bus in question left Roanoke about 45 minutes late. While waiting for the belated bus, Olderson was jokingly taunted by some of his co-employees over the prospect of starting from Roanoke late, but he countered by remarking that he would reach Washington on time, nevertheless. The night was dark and rainy. The bus skidded at Buchanan, about 25 miles from Roanoke. One witness testified: "The rear wheels skidded. Now I don't know whether it skidded to the left or the right on the highway, but I know it was enough to scare me, and I ride the buses all the time." Another witness was asked whether the driver slowed down after the skid at Buchanan, and her answer was: "He slowed down for a while, but he started to go fast again." The testimony of another witness was to the same effect.

There is conflict in the evidence as to the rate of speed generally and as to the rate at the time of the accident, but it seems to us that those witnesses who estimate the rate at the time of the accident at 45 miles an hour are corroborated by the physical facts, namely, that the impact of the bus with the guard rail and the sturdy supporting posts was of such violence as to completely uproot five of the posts, and still have sufficient momentum to go over

the six-foot embankment, capsize and land on its top with its wheels in the air.

A witness who sat in the second seat from the front testified that the driver did not shift the gears as the bus descended the hill, but that about half way down he applied the brakes; that that caused the bus to skid, and that he then "stepped on his gas to try to get out of the skid and hit the posts and guard rail."

In the testimony adduced counsel for the defendant stressed the fact that it was a rainy night. It was shown that to some extent—just how much is not altogether clear —the highway was coated with a clay slime at the point of the accident, and that fact is emphasized as being the proximate cause of the disaster. Moreover, at the request of counsel for the defendant, the trial court gave an instruction submitting to the jury the theory that the accident might have been due solely to the slippery condition of the highway. It rained more or less from the time the bus left Roanoke, and that fact of course increased the duty of caution resting upon the man at the wheel.

The verdict for the plaintiff is amply supported by credible evidence, and this is doubly true when, as here, the safety of passengers should be guarded "as far as human care and foresight will go." *Richmond-Ashland Ry. Co.* v. *Jackson,* 157 Va. 628, 162 S. E. 18, 22; *Farish & Co.* v. *Reigle,* 11 Gratt. (52 Va.) 697, 62 Am. Dec. 666. The jury's verdict is conclusive upon this court. *Southern Ry. Co.* v. *Wilmouth,* 154 Va. 582, 153 S. E. 874.

The testimony of the witness, Avery, who stated that he overheard Olderson say to other drivers at Roanoke that he would arrive in Washington on schedule time despite the fact that he would be late in leaving Roanoke, was objected to by counsel for the defendant on the ground that, Olderson being dead, the evidence was incompetent under section 6209 of the Code of Virginia. Its admission is assigned as error. That section provides that in an action against a person who, for any cause, is incapable of testifying, no judgment shall be rendered in favor of an

adverse or interested party founded on his uncorroborated testimony. We can not see that it has any application in the present case. Apparently counsel came to the same conclusion, for in this court the point is made for the first time that the testimony was incompetent for other reasons. This is not permissible. *Warren* v. *Warren,* 93 Va. 73, 24 S. E. 913; *McCrorey* v. *Thomas,* 109 Va. 375, 63 S. E. 1011, 17 Ann. Cas. 373.

The defendant objected to the reading of the depositions of Dixon and Hardy, two witnesses who testified that about six months prior to the accident they, as drivers for another bus company to which Olderson had applied for a position as driver, had tested Olderson's qualifications. They stated facts tending to show that he was disposed to take more or less hazardous chances. The admission of this evidence is assigned as error, and *Virginia Ry. & P. Co.* v. *Davidson,* 119 Va. 313, 89 S. E. 229, 230, is cited. In that case, this court, having before it the question of the propriety of a certain instruction given the jury by the trial court, said:

"The mere retention in service of a careless employee does not give rise to a cause of action against the employer. * * * In all such cases there must be evidence of some intervening negligence which is the proximate cause of an accident. The unfitness must result in some specific act of negligence or incompetency before any liability attaches."

It does not seem to us that the case is in point here. The plaintiff does not rest his case solely upon the general charge of incompetency of the driver. Nor is the evidence at all lacking in the specific features required by the above obviously sound rule. Certainly nothing is of more fundamental importance in the conduct of the highly responsible business in which the defendant is engaged than to exercise the utmost care in the selection of those who are to be entrusted with the operation of its buses.

In brief: The whole theory of the provisions which except certain designated classes of travelers from the operation of the general provisions of the statute against free

462

transportation by common carriers is, not that such excepted travelers are carried free, but merely that their transportation is compensated for in a way or ways different from that governing ordinary travelers. Specifically, Hamilton was not in reality travelling free at all. In issuing the pass in question to the Southeastern the Atlantic was simply conforming to a long-established custom; but it would not have so conformed had it thought for a moment that the Southeastern would fail to respond in kind. It was a case of turn and turn about. And when Hamilton used the transportation token furnished him by his employer, and when he signed the release upon its back, he was acting under circumstances which, in a practical sense, allowed him no alternative. Virtually it was under duress. And, finally, the evidence supports the verdict. It should be affirmed.

CAMPBELL, C. J., and EGGLESTON, J., unite in this dissent.