# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## JOHN MANIERI v. SEABOARD AIR LINE RAILWAY COMPANY.

### March 17, 1927.

#### Absent, Burks, J.

1. CARRIERS OF LIVE STOCK—*Quarantine—Shipper Misinformed by Carrier—Action by Shipper for Damages—Case at Bar.*—In the instant case, plaintiff, a butcher, acting upon representations of defendant carrier's agent, shipped cattle from Williamsburg county, South Carolina, to the Union Stock Yards, Richmond, Virginia, for immediate slaughter. When the cattle reached Richmond, plaintiff was advised by defendant that they could not be unloaded because they came from infected territory and that it would be necessary to get a certificate from the State veterinarian. Plaintiff was unable to secure this, and defendant returned the cattle to South Carolina and subsequently sold them for the gross sum of $410, applying $366.41 of the amount to defendant's freight bill and other charges, and tendered balance to the plaintiff, who refused to receive it. Plaintiff brought suit to recover the sum of $1,216. The contract of shipment provided that defendant should not be liable for a mistake or inaccuracy in information furnished by the carriers, its officers or agents, as to quarantine or other laws or regulations.

   *Held:* That the provision in the contract exempting the defendant from liability for misinformation was valid, and plaintiff could not recover for damages resulting therefrom, but was entitled to judgment for the freight charges illegally collected.

2. INTERSTATE COMMERCE—*Liability of Carrier on Interstate Shipments—Liability Governed by Carmack Amendment of the Hepburn Act—Case at Bar.*—The instant case was an action by a shipper against a carrier of live stock for damages, and the shipment involved being an interstate shipment, and Congress having occupied the field of interstate commerce by the passage of the Carmack amendment of the Hepburn act, of June 29, 1906 ( U. S. Comp. St. sections 8604a, 8604aa), all questions of law involving the liability of interstate carriers must be determined by reference to the Federal decisions construing this act.

3. CARRIERS OF LIVE STOCK—*Duties of Carrier—Liability of Carrier.*—

There is no question that a carrier must furnish, upon request, suitable cars for shipment of live stock, when not interdicted by Federal or State laws; that the rate therefor must be reasonable and uniform; and that, generally, it will be liable for any injury occasioned by its negligence.

4. NEGLIGENCE—*Legal Duty.*—Negligence presupposes a legal duty. There can be no negligence where there is no breach of duty.

5. CARRIERS OF LIVE STOCK—*Negligence—Furnishing False Information as to Quarantine Regulations—Exemption from Liability—Case at Bar.*—In the instant case, an action for damages by a shipper of live stock against a carrier, the contract provided in specific terms that the failure to furnish correct information in regard to the existence of quarantine regulations should not render the defendant liable. Plaintiff contended that this exemption from liability was invalid because it was an agreement for exemption from liability for injury occasioned by the carrier's own negligence. There was no claim that the information relied on was furnished wilfully or was fraudulent in fact, although unquestionably erroneous.

*Held:* That the shipper was charged with notice of the quarantine regulations under U. S. Comp. St. section 8698, and that the agreement as to nonliability did not fall within the rule that a carrier will not be permitted to contract against its own negligence.

6. FRAUD AND DECEIT—*Misrepresentation—Knowledge of Other Party.*—Unless the fraud relied on consists of misrepresentation of facts, or in the concealment of facts by which one is misled, and the party injured had no other means of knowledge, no recovery may be had.

7. CARRIERS OF LIVE STOCK—*Exemption from Liability—Misinformation as to Quarantine Regulations—Case at Bar.*—In the instant case, an action by a shipper against a carrier, the contract provided that the carrier should not be liable for failure to furnish correct information in regard to quarantine regulations. Neither the State nor Federal statutes impose upon a carrier the duty of furnishing prospective shippers information as to the existence of quarantine regulations.

*Held:* That the service rendered being in no sense a discharge of a legal duty, the agreement as to nonliability does not fall within the rule that a carrier will not be permitted to contract against its own negligence.

8. CARRIERS OF LIVE STOCK—*Relation of Trust and Confidence between Carrier and Shipper—Information Concerning Quarantine Regulations—Case at Bar.*—In the instant case, an action by a shipper against a carrier of live stock, plaintiff contended that the carrier was liable for misinformation in regard to quarantine regulations because a relation of trust and confidence existed between the parties. Both parties had an equal opportunity to obtain the desired quarantine information and this being true, no peculiar relation of trust and confidence could exist between them.

9. FRAUD AND DECEIT—*Relation of Trust and Confidence.*—In order to create a relation of trust and confidence there must be a duty resting upon one party to the other party.

10. CARRIERS OF LIVE STOCK—*Action for Damages for Misinformation Regarding Quarantine Regulations—Case at Bar.*—In the instant case, a shipper sued a carrier of live stock for damages arising out of misinformation as to quarantine regulations furnished the shipper by the carrier.

   *Held:* That defendant was under no legal duty to furnish the plaintiff with information in regard to quarantine area or regulations, and that in the absence of fraud in law or in fact, there could be no recovery.

Error to a judgment of the Corporation Court of the city of Petersburg, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed and final judgment for plaintiff.*

The opinion states the case.

*William Amoroso* and *Leon M. Bazile,* for the plaintiff in error.

*Munford, Hunton, Williams & Anderson,* and *Whiting C. Faulkner,* for the defendant in error.

CAMPBELL, J., delivered the opinion of the court.

This is an action by notice of motion brought by the plaintiff in error against the defendant in error to recover the sum of $1,216.

On the trial of the action, the defendant demurred to the evidence, and the case is before this court upon a writ of error to the judgment of the trial court sustaining the demurrer.

The material facts are undisputed and may be summarized thus:

[1] Plaintiff is a butcher, residing in Hopewell, Virginia. In May, 1923, he was informed that he could purchase cattle in Williamsburg county, South Carolina, and acting on such information, went to Hemingway, South Carolina, in said county, during the month of May, 1923. When he arrived there he inquired of the agent of the defendant as to whether the defendant could accept for shipment to Hopewell, Virginia, a carload of cattle, and was informed that the shipment could be made. Relying on the information, plaintiff purchased from different parties thirty-two head of cattle and requested the defendant to furnish him a car in which to ship the same. The cattle were bathed as required by law and loaded in the defendant's car, when only a few minutes before the train was to leave plaintiff was asked by defendant's agent to unload the cattle as the agent stated that he had to take the matter up with the division superintendent. The next day plaintiff was called by defendant's agent who exhibited to him four telegrams. The first telegram was sent by the defendant's agent to the defendant's superintendent at Charleston, South Carolina and reads as follows: "Please advise if I can accept ordinary cattle for shipment, Hopewell, Virginia." The second telegram was from the defendant's superintendent to the defendant's agent at Hemingway, South Carolina, and reads as follows: "Tariff shows Virginia quarantined cattle for dairy or grazing purposes and such will have to be accompanied by proper certificate, no restriction on cattle for immediate slaughter." The third telegram was from defendant's agent to defendant's superintendent at Charleston, South Carolina, and reads as follows: "Your wire 5th Veterinarian advises that we have no right to accept cattle for shipment to Virginia. Please advise quick if I may accept this stock without

Veterinarian certificate same for immediate slaughter,'' to which the defendant's superintendent replied in the fourth telegram: "Your wire date upon consulting Mr. Graves he advises cannot be to Hopewell, Virginia, but that same can be handled only to following consignees and points in Virginia, A. Greensberg, Danville, Banks Bros., Norfolk, Richmond Union Stock Yards, Richmond, for immediate slaughter.''

Acting upon the representations of the defendant's agent and the telegrams from its superintendent that the cattle be shipped to the Union Stock Yards, Richmond, Virginia, for immediate slaughter, plaintiff shipped said cattle for immediate slaughter to the Union Stock Yards, Richmond, Virginia.  When the cattle reached Richmond, plaintiff was advised by defendant that the same could not be unloaded for the reason that the cattle came from infected territory, and that it would be necessary to get a certificate from the State Veterinarian.  Plaintiff was unable to secure this, and the defendant thereupon returned the cattle to South Carolina and subsequently sold the same for the gross sum of $410, applying $366.41 of said amount to the defendant's freight bill, feeding, and other charges in connection with the transportation of said cattle to and from Richmond, Virginia; the balance, $73.59, was tendered to plaintiff and refused by him.

The defendant demurred to the evidence upon the grounds that:

(1)  The defendant had been guilty of no breach of its duty to the plaintiff as a carrier of live stock.

(2)  The defendant was prevented from making delivery of the cattle in accordance with contract of carriage by quarantine regulations in effect at time of shipment, and any representation made by the agent of the carrier as to delivery of the cattle in Richmond was not binding upon the carrier.

(3) Defendant was not required to handle in violation of the quarantine regulations notwithstanding acceptance.

(4) Defendant was not liable under the express provisions of section 1 of the live stock contract for mistake or inaccuracy of information furnished by the carrier, its officers, or agents as to quarantine or other laws or regulations.

(5) That the contract of shipment was made in violation of law and neither party can recover upon an illegal contract.

In sustaining the demurrer the trial court rested its decision upon the theory advanced by the defendant, that under the provisions of the standard live stock contract the defendant is not liable for any mistake or inaccuracy in any information furnished by its agents or officers, as to quarantine or other laws or regulations; that the defendant was not required to handle, in violation of quarantine regulations, notwithstanding acceptance of shipment; that the representation made by the defendant's officers or agents is not binding upon the defendant.

[2] This being an interstate shipment, and Congress having occupied the field of interstate commerce by the passage of the Carmack amendment of the Hepburn act, of June 29, 1906 (U. S. Comp. St. 8604a, 8604aa), all questions of law involving the liability of interstate carriers must be determined by reference to the Federal decisions construing this act.

In *Williamson* v. *S. A. L. Ry. Co.*, 136 Va. 626, 118 S. E. 255, West, J., said: "The decision of all questions arising under the laws of the United States, and especially under the commerce clause of the Constitution, rests conclusively with the Federal courts. *Western Union Tel. Co.* v. *Bowles*, 124 Va. 735, 98

S. E. 645; *United States* v. *Hill*, 248 U. S. 420, 39 Sup. Ct. 143, 63 L. Ed. 337." See *Mo. Kans. & Tex. Ry.* v. *Harriman*, 227 U. S. 657, 33 S. Ct. 397, 57 L. Ed. 690.

By act approved February 2, 1903 (32 Stat. at L. 791, section 1 [U. S. Comp. St. section 8698] ), the secretary of agriculture is given the following authority: "He is hereby authorized and directed, from time to time, to establish such rules and regulations concerning the exportation and transportation of live stock from any place within the United States where he may have reason to believe such diseases may exist into and through any State or territory, including the Indian territory, and into and through the District of Columbia and to foreign countries, as he may deem necessary, and all such rules and regulations shall have the force of law."

By an act approved March 3, 1905, section 2 (33 Stat. at L. 1264, section 2 [U. S. Comp. St. section 8702] ), all railway companies, owners of steam or sailing vessels or boats, are inhibited, under penalty, from receiving for transportation, and all persons, companies or corporations are inhibited, under penalty, from delivering for transportation to such companies, etc., any cattle or other live stock coming from any quarantined portion of any State or territory or the District of Columbia.

By virtue of the power conferred by these statutes, the Secretary of Agriculture promulgated rules and regulations governing the interstate shipment of live stock.

Regulation 2, section 1, provides: "Interstate shipments of cattle from points in the quarantined area may be made at any time by rail or boat for immediate slaughter:   Provided, 'That the proper official of the

State or territory, or the District of Columbia, to which the shipment is destined has granted permission for the acceptance and handling of southern cattle; and provided, further, that in their movement the provisions contained in sections 1, 2 and 11, hereinafter set out in this regulation, are strictly observed and complied with. ' ''

At the date of shipment here involved, Williamson county, South Carolina, was under the ban of a quarantine proclamation issued by the Governor of Virginia.

It is the contention of plaintiff that he is entitled to recover in this action because the statements made by the agents of the defendant were fraudulent; that they were statements involving both law and fact, and on the further ground that a peculiar relationship of trust or confidence existed between the parties.

It was also contended in argument that the collection of freight charges was illegal.

These various contentions will be considered collectively.

The standard live stock contract, duly signed by the plaintiff, contained a provision that the defendant shall not be liable for any mistake or inaccuracy in any information furnished by the defendant, its agents or officers, as to quarantine regulations.

It is maintained by the plaintiff that this provision is invalid because it is an agreement made by the defendant for exemption from liability for injury occasioned by its own negligence, and because it is not supported by an adequate consideration. Under the common law, the State statutes, and the Carmack amendment, a carrier is precluded from entering into a contract exempting it from liability on account of its own negligence. Does the question of negligence arise in the case at bar?

[3, 4] There is no question that a carrier must furnish, upon request, suitable cars for shipment of live stock, when not interdicted by Federal or State laws; that the rate therefor must be reasonable and uniform; and, generally, it will be liable for any injury occasioned by its negligence.   Negligence presupposes a legal duty. *N. & W. Ry. Co.* v. *Wood*, 99 Va. 156, 37 S. E. 846; *Williamson* v. *Southern Ry. Co.*, 104 Va. 146, 51 S. E. 195, 70 L. R. A. 1007, 113 Am. St. Rep. 1032; *Virginia Ry. & P. Co.* v. *Winstead*, 119 Va. 326, 89 S. E. 83.

In Shearman & Redfield on the Law of Negligence, section 10, page 17, it is said: "As a matter of course, there can be no negligence where there is no breach of duty.   It must appear, therefore, not only that the defendant owed a duty, but also that he did not perform it."

[5, 6] In the instant case the contract provides in specific terms that the failure to furnish correct information in regard to the existence of quarantine regulations shall not render the defendant liable.   Counsel have not cited us to a case, nor have we been able to find one similar to the case at bar.

In our examination of the authorities we discover that the basis of the holding in each case depends upon performance or nonperformance of a common law or statutory duty, or the negligent and wilful imparting of information peculiarly within the knowledge of the officers or agents of the carrier.

There is no claim that the information relied on was furnished wilfully or was fraudulent in fact.   It is patent—judged by subsequent events—that it was erroneous.   Unless the fraud relied on consists of misrepresentation of facts, or in the concealment of facts by which one is misled, and the party injured had no other means of knowing, then no recovery may be had. *Max Meadows, etc., Co.* v. *Brady*, 92 Va. 83, 22 S. E. 845.

There is no evidence that the officers or agents of the defendant knew of the existence of the Virginia quarantine. There is, however, evidence that the defendant had the means of acquiring the desired information.

An examination of both the Federal and State acts fails to disclose the imposition of the duty upon a carrier to furnish a prospective shipper information as to the existence of quarantine regulations. The service sought to be rendered was gratuitous; no legal duty rested upon the defendant to supply the information asked for. While perhaps not quite as convenient for the plaintiff to ascertain for himself as it was to seek the aid of the defendant, he had the same means of obtaining the information sought as did the defendant.

The law provides for the publication of the rules and regulations of the Bureau of Animal Industry and further provides that the same shall have the force and effect of law. The plaintiff was, therefore, charged with notice of such quarantine regulations. All he had to do to obtain the desired information was to communicate with the proper authorities in Richmond.

The service rendered being in no sense a discharge of a legal duty, the agreement as to nonliability does not fall within the rule that a carrier will not be permitted to contract against its own negligence.

[8, 9] To sustain the contention that a relation of trust or confidence existed between the parties, many authorities are cited by plaintiff. These cases are not in point, as no quarantine question was involved. As stated, both parties had an equal opportunity to obtain the desired information. This being true, no peculiar relation of trust or confidence could exist between the parties. They were dealing at arm's length. In other words, in order to create a relation of trust and confidence there must be a duty resting upon one party to the other party.

[10]  For the reasons stated we are of the opinion that the trial court was correct in its conclusion that the defendant was not guilty of fraud either in law or in fact; that the defendant was under no legal duty to furnish the plaintiff with information in regard to quarantine area or regulations; that the provision in the bill of lading or contract exempting the defendant from liability is valid, but in view of the undisputed fact that the defendant illegally collected from the plaintiff the sum of $366.41, freight charges, which was an element of damage involved, the trial court should have overruled the demurrer to the evidence, put the plaintiff upon terms to remit the sum of $390.00 from the $800.00 verdict of the jury, and entered judgment in favor of the plaintiff for the sum of $410.00, subject to a credit of $73.59, being the amount tendered by defendant, and paid into court.

Pursuant to section 6365 of the Code, which provides that this court shall enter such judgment as to it seems right and proper where a judgment is reversed, this court will enter judgment in favor of John Manieri against the Seaboard Air Line Railway Company, a corporation, for the sum of four hundred and ten dollars ($410.00), with interest on the sum of three hundred and thirty-six dollars, and forty-one cents, a part thereof, from the 28th day of June, 1923, and with interest on the sum of seventy-three dollars and fifty-nine cents from the 6th day of May, 1924, together with costs in favor of the plaintiff both in the trial court and in this court.

*Reversed and final judgment for plaintiff.*