# Richmond

## RAVEN RED ASH COAL COMPANY, INCORPORATED v. BESSIE GRIFFITH, ADMINISTRATRIX OF THE ESTATE OF DOUGLAS GRIFFITH, DECEASED.

October 11, 1943.

Record No. 2706.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*H. M. Bandy, Joseph S. Gillespie* and *R. O. Crockett,* for the plaintiff in error.

*Griffith & Greenwood,* for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

Douglas Griffith, while employed in a coal mine owned and operated by Raven Red Ash Coal Company, Inc., was killed by an explosion in the mine. His widow and dependent children filed before the Industrial Commission of Virginia a claim for compensation which, after a full hearing, was denied on the ground that the evidence failed to show that the deceased "was engaged in anything in furtherance of the interest of his employer at the time the explosion occurred", and that hence the fatal accident "did not arise out of and in the course of the employment." No appeal was taken from this finding and order of the Commission.

Thereupon Bessie Griffith, administratrix of the decedent's estate, filed a notice of motion for judgment against Raven Red Ash Coal Company, Inc., seeking to recover damages for the alleged wrongful death of the decedent. The gist of the claim was that the decedent's death was proximately due to the negligence of Raven Red Ash Coal Company, Inc., in that it failed to keep its premises reasonably safe for the protection of the decedent who was an invitee thereon.

By appropriate special pleas the Raven Red Ash Coal Company, Inc., asserted the defense that the Workmen's Compensation Act (Michie's Code of 1936, section 1887(1), etc.; Acts 1918, ch. 400, p. 637, as amended), under which the defendant employer and the decedent employee were operating, barred an action at law for damages for the

wrongful death of the decedent even though his death was not due to an accident arising out of and in the course of the employment, and was not compensable under the Act. The lower court sustained this view and a final judgment in favor of Raven Red Ash Coal Company, Inc., resulted. We reversed that judgment and remanded the case for a new trial, holding that section 12 of the Workmen's Compensation Act (Michie's Code of 1936, section 1887(12) ), providing that the rights and remedies granted under the Act were exclusive, was intended to exclude common-law remedies only for injury or death of an employee caused "by accident arising out of and in the course of the employment", but that the Act did not impair the common-law right of action for damages for injury or death of an employee not so arising. *Griffith* v. *Raven Red Ash Coal Co.*, 179 Va. 790, 797, 20 S. E. (2d) 530, 533.

Upon a trial on the merits the administratrix has recovered a verdict and judgment which are before us on a writ of error granted the Raven Red Ash Coal Company, Inc. The main contention is that the evidence fails to show that the decedent's death was proximately due to the violation of any duty which the Coal Company owed to him.

There is little conflict in the material and controlling evidence. The Raven Red Ash Coal Company, Inc., which will be sometimes referred to as the defendant, was at the time of the accident, on March 1, 1940, engaged in mining coal in its No. 4 mine in Russell county, Virginia. In the process of mining and removing this coal the defendant used electrically driven cutting machines, each of which is equipped with a blade or saw which cuts a horizontal strip about four inches in width at the bottom of the vein or seam of coal. After such a strip has been cut to the capacity of the machine, which is about six feet, "loaders" are employed to dislodge or "shoot down" the coal and load it into conveyors where it is taken from the mine.

When the loose coal has been removed, the machine proceeds to make another cut in the seam of coal, after which the coal is again shot down and removed by the loaders. The tunnel or channel which is being excavated in this manner is referred to as a "room."

At the time of the accident Griffith was employed as a loader in connection with a cutting machine which was assigned to work in Room No. 21. This room or tunnel was being driven in a northwardly direction and parallel to a similar room which is referred to in the proceedings as "No. 10 Left Aircourse," and from which the coal had previously been removed for a distance of about 130 feet beyond the northern end of Room No. 21. The two rooms were separated by pillars of coal which served to support the ceiling. The opening or space between two such pillars is called a "break-through."

Ventilation was furnished to the mine by electric fans placed at the entrance which drove the air through the various rooms or courses, the direction of the current being controlled by curtains or "brattices." Ample ventilation was furnished in Room No. 21, where the deceased was required to work, and also in the southern or contiguous portion of No. 10 Left Aircourse. However, no means were provided for forcing the air into the northernmost portion of No. 10 Left Aircourse, which extended beyond the projection of Room No. 21. The general superintendent of the mine explained that this was because no work was being carried on there.

The following diagram will serve to illustrate the layout which has been described. The block-like objects are pillars of coal. The lines connecting such pillars represent "brattices." The arrows indicate the direction and course of the ventilating air current.

When Griffith reported for work on the morning of the accident, the cutting machine was working at the upper or northern portion of Room No. 21, at the point on the diagram designated and marked "Machine." It first cut into the "rib" of coal to the right which served as a partition between Room No. 21 and No. 10 Left Aircourse. It was then turned to the left and proceeded to cut into the northern face of the coal as indicated on the diagram.

Under the rules of the company the loaders were required to withdraw from the cutting machine while it was in operation. While waiting for the machine to complete its operation before he could proceed with his work of shooting down and loading the coal, Griffith was last seen standing in Room No. 21, at or near the northernmost breakthrough (indicated by the letter "A" on the diagram) leading into No. 10 Left Aircourse. This was about thirty feet to the rear of the machine. About fifteen minutes later, and while the machine was cutting into the face of the coal at the northern end of Room No. 21, there was a violent explosion which seemed to have its inception in the northern portion of No. 10 Left Aircourse. Work in the mine was stopped immediately and upon investigation Griffith's body was found in the northern end of No. 10 Left Aircourse, at or near the point marked on the map "Body found here." This point was approximately 110 feet north of the break-through where he had last been seen. His face and hands were badly burned. A tobacco can containing cigarettes was found near the body and one cigarette was outside the can. However, no charred or burned matches were found near by.

It was the opinion both of the State mine inspectors and of the superintendent and other employees of the defendant company that the explosion had its inception at or near the point where Griffith's body was found. This, they say, was indicated by the direction of the force of the explosion, the manner in which the debris was scattered, the presence of burns on the body of the deceased, and the absence of burns on the cutting machine or elsewhere.

The witnesses were likewise unanimous in the view that the explosion was caused by the ignition of methane gas which had accumulated in the northern portion of No. 10 Left Aircourse, and which in turn had ignited and exploded the coal dust suspended in the air.

What caused the gas to ignite is not shown. It was the theory of the plaintiff below that it had accumulated in No. 10 Left Aircourse, had seeped through a three-inch hole which had been cut by the machine through the partition or wall separating that room from Room No. 21, and was ignited by sparks created when the blades of the cutting machine struck "sulphur balls" or some similar hard substance embedded in the coal. While there was evidence that methane gas could be ignited in this manner, there is not a scintilla of evidence that at the time of the explosion the blades of the machine were causing such sparks. Indeed, all of the evidence is directly to the contrary. Moreover, as has been said, all of the witnesses agree that the inception of the explosion was in No. 10 Left Aircourse, at or near the point where Griffith's body was found.

It appears from the testimony both of the State mine inspectors and of the employees of the defendant company that despite frequent tests, some of which were made shortly before the accident, no gas had ever been previously discovered in this mine. Hence, it was operated by the defendant and was carried on the records of the Chief State Mine Inspector as a "non-gaseous mine."

Nevertheless, the administratrix claims that it was the duty of the defendant company to have inspected that portion of No. 10 Left Aircourse, where the decedent's body was found, and to have made it reasonably safe for its employees, including the decedent, and that the jury had the right to find that the defendant was negligent in not doing so.

It is true that the evidence on behalf of the administratrix showed that an inspection of the place just prior to the explosion would have disclosed the presence of the gas accumulated there. But while Brown, the principal expert

witness for the administratrix, testified that it was customary to make daily inspections of the "working places" in the mine, such inspections of "abandoned places" or "places temporarily abandoned," were not customary or practical, for, as he said, this would require "inspecting all the time."

The undisputed evidence is that the coal had been removed from the place where Griffith's body was found two or three weeks before the accident. In the meantime no work had been carried on there and hence it was not a "working place," but, on the contrary, was at least "temporarily abandoned." The height of the "room" or tunnel at this place was only thirty inches, and in order for Griffith to have reached the spot where his body was found, he must have crawled a distance of more than 100 feet along this restricted passageway.

In this situation the defendant claims that the deceased was not at the time of the accident at a place where his work required him to be, or where his employer might have reasonably expected him to be, and that, therefore, it owed him no duty of inspection to make such a place reasonably safe, and was not guilty of any breach of duty or negligence in not doing so.

There is an entire lack of evidence as to why the deceased left Room No. 21 and went to the northern end of No. 10 Left Aircourse where his body was found. The rules of the company required him to withdraw from the vicinity of the cutting machine while it was in operation, but there was no requirement or necessity for his leaving Room No. 21. While Jamison, the operator of the cutting machine, first testified, in answer to leading questions propounded by counsel for the administratrix, that the deceased was required to leave that room, he later corrected that statement by saying that the deceased was only required to withdraw from the immediate vicinity of the machine. This latter statement is in entire accord with the testimony of other witnesses, and, indeed, it is apparent from the physical situation. Room No. 21 was more than 150 feet long and more than 20 feet wide. Since the cutting machine,

which was located at the northern extremity of the room, was not more than ten feet long, there was ample space to which the deceased could have withdrawn from the machine without leaving the room. None of the workmen who remained in Room No. 21 was injured. Indeed, Griffith was the only casualty from the explosion.

In the brief of the administratrix it is argued that Griffith went into No. 10 Left Aircourse for the purpose of "tapping" and determining the thickness of the wall of coal just to the right of the cutting machine and separating the two rooms, and that the explosion occurred and he was killed while performing this duty.

This argument has no place in the present case. It should have been advanced in the proceedings before the Industrial Commission, for if the deceased was so engaged at the time of the explosion then manifestly his death occurred by an "accident arising out of and in the course of the employment," and his dependents would have been entitled to compensation under section 2(d) of the Workmen's Compensation Act (Michie's Code of 1936, section 1887 (2)(d) ). And yet it appears from the proceedings before the Industrial Commission, which are set out *in extenso* in the record on the former appeal, that the Commission, after a full hearing of the matter, determined that at the time of his death the deceased was not engaged in any business for his employer, but that "He was away from the place assigned him on an unexplained mission". No appeal was taken from that finding and the matter is now *res judicata* and binding on the widow and other dependents of the deceased who are the substantial parties in interest here.

The same is true of the contention that the deceased, pursuant to custom, went into No. 10 Left Aircourse for the purpose of answering a call of nature. It is well settled that where an employee stops work for a short while to satisfy his physical needs,—such as to take a drink of water or to go to a near-by toilet on the premises of the employer, —he is still in the master's employment and is entitled to all of the benefits of the Workmen's Compensation Act.

*Bradshaw* v. *Aronovitch*, 170 Va. 329, 336, 337, 196 S. E. 684, 686, 687; 35 Am. Jur., Master and Servant, section 172, pp. 600, 601; 23 A. L. R. 706, note; Ann. Cas. 1913C, 943; Ann. Cas. 1918A, 1194, collecting numerous cases.

Moreover, the undisputed evidence in the present proceeding is that Griffith was assigned to work in Room No. 21, where the cutting machine was operating, and had no business or duty, which required him to go into that portion of No. 10 Left Aircourse where his body was found. This is the direct and uncontradicted testimony of Hooker, the assistant section foreman under whom the deceased was working at the time of the accident.

It is argued that since this was a "non-gaseous mine" and the men were allowed to smoke, the deceased may have gone there for that purpose. But there is no evidence that the men were required to leave their working places in order that they might enjoy a smoke, or that they were in the habit of repairing to this or any similar remote place for such purpose.

The argument is also made that the employees frequently used "worked-out" places as toilets, that the defendant company knew or ought to have known this, and, therefore, should have taken steps to keep this particular place in a reasonably safe condition.

In the first place, there is no evidence that the employees had been using this or any such remote place for that purpose. In the next place, as we have seen, even if the deceased went to this place for that purpose, the remedy of his dependents would have been in a proceeding before the Industrial Commission and not in a common-law action for death by wrongful act.

Again, the positive and uncontradicted evidence is that the workmen were forbidden, without the permission of their foreman, to go to such an abandoned part of the mine. There is no contention here that such permission was granted.

The books are full of reported cases of this character where an employee leaves his place of employment, and for

his own pleasure, convenience or curiosity goes to some remote place on the employer's premises and is injured. The principles governing the duties and rights of the master and servant in such a situation are firmly fixed. As is said in 4 Labatt's Master & Servant, 2d Ed., section 1558, pp. 4697-8:

"* * * 'a master's duty in respect to furnishing his servants a safe place in which to work extends to such parts of his premises only as he has prepared for their occupancy while doing his work, and to such other parts as he knows or ought to know they are accustomed to use while doing it.' The application of this principle has frequently prevented recovery in cases where the injury proximately resulted from the fact that the injured servant was occupying the dangerous position merely for his own convenience and accommodation. Under such circumstances his legal rights are no greater than those of a licensee."

In 35 Am. Jur., Master and Servant, section 185, p. 613, it is said: "As a rule, the employer is required to provide for the safety of that portion of his premises where his employees are required to labor, and of other places thereon which they are expressly or impliedly invited and permitted to use, or which the employer knows or ought to know they are accustomed to use. It is well established that this obligation extends to the places of entrance to and exit from the place where the work is performed. This is the limit of the employer's liability; if the employee goes to other parts of the premises for purposes of his own, he is not entitled to hold the employer liable for injuries received by him."

And in the same work it is further said: "If an employee voluntarily and unnecessarily leaves his place of employment and assumes a position of peril merely for his own pleasure or convenience, he ceases to be an employee for the time being and becomes either a trespasser or at best a mere licensee. This is true where an employee leaves his place of work and goes to another part of the employer's premises which is not intended for his use.

"The issue with respect to the employer's responsibility is to be determined by the showing as to whether he knew or ought to have known of the victim's presence at the place where the calamity occurred."  35 Am. Jur., section 171, p. 600.

These principles are supported by authorities too numerous to be cited here.  We refer only to a few of the leading cases.  See *Ellsworth* v. *Metheney* (C. C. A. 6), 104 F. 119, 51 L. R. A. 389; *Pioneer Min., etc., Co.* v. *Talley*, 152 Ala. 162, 43 So. 800, 12 L. R. A. (N. S.) 861; *Kennedy* v. *Chase*, 119 Cal. 637, 52 P. 33, 63 Am. St. Rep. 153; *Gypsy Oil Co.* v. *Ginn*, 88 Okla. 99, 212 P. 314; *King* v. *Mendota Coal Co.*, 163 Iowa 181, 143 N. W. 539, L. R. A. 1916F, 1220; *Morrison* v. *Burgess Sulphite Fibre Co.*, 70 N. H. 406, 47 A. 412, 85 Am. St. Rep. 634; *Harris* v. *Det Farenede Dampskibselskab*, 75 N. J. L. 861, 70 A. 155.

If we consider the rights and duties of the decedent and his employer as invitee and owner of the premises, respectively, we reach the same conclusion.  It is well settled that "The duty which a property owner owes to an invitee is co-extensive with and limited by the invitation. In other words, the duty of exercising ordinary care to render the premises reasonably safe for the visit does not extend to places beyond the invitation and to which the invitee is not reasonably expected to go."  *Knight* v. *Moore*, 179 Va. 139, 146, 18 S. E. (2d) 266, 269, 270.  See also, *Eastern Shore of Virginia Agricultural Ass'n* v. *LeCato*, 151 Va. 614, 619, 144 S. E. 713.

As is said in 38 Am. Jur., Negligence, sec. 100, p. 761: "An owner or occupant is liable for an injury sustained by a person, who entered the premises by invitation, as a result of a defective condition of the premises only where the part of the premises upon which the injury was sustained was covered by the invitation.  If a person, although on the premises by invitation, goes to a place not covered by the

invitation, the owner's duty of care owed to such person as an invitee ceases forthwith."

When an invitee goes to a place not covered by the invitation he becomes at best a bare licensee to whom the owner of the premises owes no "duty of prevision or preparation." He takes the risk of the place as he ·finds it. *Pettyjohn & Sons* v. *Basham*, 126 Va. 72, 77, 78, 100 S. E. 813, 38 A. L. R. 391.

In *Thalhimer Bros.* v. *Casci*, 160 Va. 439, 444, 445, 168 S. E. 433, we said:

"A trespasser or bare licensee takes the situation as she finds it. The duty to each is the same. No prevision is required. Of course no wanton or wilful injury can be inflicted. Beyond this she must depend upon herself.

" 'So also with respect to a bare licensee (that is to say one who is permitted by the passive acquiescence of the owner to come on his premises for his own convenience). "He takes upon himself all the ordinary risks attached to the place and the business carried on there." The owner must not intentionally or wilfully injure him, but he owes him the active duty of protection only after he knows of his danger, or might have known of it and avoided it by the use of ordinary care. These principles have been repeatedly announced by this court and are conclusive of the case.' *Lunsford's Adm'r* v. *Colonial Coal & Coke Co.*, 115 Va. 346, 79 S. E. 347, 349."

Such is the situation before us. Since it conclusively appears from the evidence that the deceased was not on that part of the premises to which he had been invited to go, or where the defendant might reasonably have expected him to be, he was a mere licensee, to whom the defendant owed no duty of prevision or inspection to see that such portion of ·the premises were made safe for his use.

But the administratrix contends that these principles, well settled by the common law, were changed by certain pro-

visions of the State mining laws in effect at the time of the accident. Code, section 1835ff.[1]

First, it is said that Code, section 1867,[2] was not complied with. This section requires a daily examination of "every working place in the mine", "to the end that such working places shall be made safe". A "working place", of course, means the place where the workman is engaged in his work—that is, where his duties reasonably require him to be. Conversely, it does not include a place where an employee is not required to work or where he is not reasonably required to go. See 71 C. J., sec. 12, pp. 31, 32, and numerous cases there cited. See also, *Erickson* v. *Maple Block Coal Co.*, 183 Iowa 1292, 167 N. W. 105, 106; *Johnson* v. *Doubleday*, 92 Vt. 267, 102 A. 1038, 1039.

It is next said that there was no compliance with Code, section 1854,[3] which provides for safeguards and protection from gas accumulating in "unused workings and abandoned parts of the mine".

---

[1] Substantial changes were made in these statutes by Acts of 1940, ch. 150, p. 223, which, however, did not become effective until after the accident here involved.

[2] *"Sec. 1867. Daily examination by mine foreman or assistant; provisions to insure safety.—*The mine foreman or his assistant shall visit and examine every working place in the mine every day while the miners are at work, and shall direct that each and every working place shall be secured by props, and cap boards or cross-timbers, whenever necessary, which shall be placed and used by the miners working therein, as in this chapter provided, to the end that such working places shall be made safe; and the said mine foreman shall not permit, nor shall any one work in a place known to be unsafe, unless it be for the purpose of making it safe. In all rib and pillar work at least one experienced miner shall be employed in each working place."

[3] *"Sec. 1854. Protection from gas in old workings.—*All old, unused workings and abandoned parts of the mine must be protected by such safeguards as would prevent the dangerous overflow of any standing gas therein, and all avenues leading thereto shall be arranged and conducted so as to give cautionary notice to all such workmen in such mines of the danger in entering therein; and in order to secure the safety of the workmen in general against the danger in said abandoned or worked out parts of the mine, proper notices shall be put up and kept standing as far as practicable, which shall afford warning to all such workmen not to enter such parts of said mine; and in addition thereto, all persons except those specially charged with that duty, are hereby forbidden to enter such parts of said mine where gas may be found."

Code, sections 1835 to 1887, both inclusive, creating the Department of Mines and containing certain safety provisions, originated in the Act of March 13, 1912 (Acts of Assembly 1912, ch. 178, p. 419). Section 10 of this Act (Acts 1912, pp. 424, 425) deals with mines "generating fire damp and where there is every reason to believe that gas will be encountered in the future workings and development of the mine". These are commonly called gaseous mines. Included in section 10 is a paragraph providing for protection and safeguards against gas in "old, unused workings and abandoned parts of the mine". This paragraph became Code, section 1854, here relied on.

In codifying this statute the revisors, without substantial change in the language used, merely divided section 10 of the Act into Code, sections 1852, 1853, 1854, 1855 and 1856.

It is perfectly manifest that these five sections of the Code, including that relied on by the administratrix, still apply to gaseous mines, as did the original act. They were not intended to apply, we think, to a mine, such as that of the defendant, where no gaseous condition had been previously found or known to exist.

The point is made in the brief of the administratrix that no plea of the general issue was filed by the defendant below. There is no merit in this contention. The precise question was before this court in *Bank of Occoquan* v. *Bushey*, 156 Va. 25, 157 S. E. 764. There, as here, the plaintiff below had recovered a verdict and judgment and when these were attacked on appeal, he made the point that no plea of the general issue had been filed. But Mr. Justice Gregory, speaking for the court, aptly said (156 Va., at pages 30, 31):

" * * * No doubt if this objection had been seasonably made in the lower court, the defendant would have filed such a plea. However, we do not think there is any merit in the point because the trial of the case proceeded just as though there had been formal joinder of issue. The defendant, without objection from the plaintiff, introduced evidence as though the pleadings had been perfected, and the

plaintiff, instead of objecting to any evidence being introduced by the defendant under the general issue, joined with him and introduced his evidence to rebut the evidence which the defendant had introduced. It is now too late to raise the point." See also, *Deatrick* v. *State Life Insurance Co.*, 107 Va. 602, 606, 59 S. E. 489, 490.

Moreover, the plea of contributory negligence plainly gave ample notice of the defense relied on, namely, that the deceased left his place of work "without reasonable excuse and went to an abandoned part of the mine", thereby assuming "all the risk incident to the safety of the said place where this fatal accident occurred."

Since the evidence here conclusively shows that the defendant company was guilty of no breach of duty which it owed to the decedent, it was not negligent and hence there can be no recovery. *Manieri* v. *Seaboard Air Line R. Co.*, 147 Va. 415, 423, 137 S. E. 496, and cases there cited.

The judgment under review will be reversed and a final judgment will be here entered in favor of the defendant below.

*Reversed and final judgment.*

Browning, J., dissenting.

No more hazardous occupation exists than that of taking coal from the bowels of the earth. This applies to the mining of all minerals but particularly is it true of coal, for it is a substance of a gaseous nature and the issues from it are likely to collect and be pent up in any aperture or open space in the mine and easily subject to explosion. The union of inflammable substances with oxygen may produce combustion.

I am mindful of the fact that the coal company alleges that this mine is a non-gaseous one. It may be sincere in the thought, but may not this condition be present today and absent tomorrow. I apprehend that the condition as to gas and allied combustible substances in subterranean pas-

sages, through seams of coal of different formations and constituents, is variable, not static.

This emphasizes the duty of effective inspection even if it did require "inspecting all the time." What is the issue of inconvenience and expense of constant inspection compared to the attainment of human safety? The verdict of the jury and the judgment of the trial court being with the plaintiff all questions of fact must be resolved in her favor.

I think that the laws governing the duties of employers with respect to the safety of their employees, especially as to mines, should be liberally construed in favor of those for whose benefit they are enacted. I am of opinion that the coal company failed to comply with its duties of inspection and failed to provide a reasonably safe place for the plaintiff's decedent to work, therefore I respectfully dissent from the majority opinion.