**Richmond**

City of Suffolk

v.

Frances B. Hewitt

September 9, 1983.

Record No. 802041.

Present: All the Justices.

*John J. O'Keefe, III (Outland, Gray, O'Keefe & Hubbard,* on brief), for appellant.

*William R. O'Brien (Brydes, Hudgins, Ege, Burt & O'Brien,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

In a motion for judgment filed against the City of Suffolk, Frances B. Hewitt sought to recover damages for personal injuries sustained when she fell down steps in a building owned by the City. Hewitt alleged that her injuries were caused by the negligence of the City in maintaining the building and in failing to warn her of its dangerous condition. A jury trial resulted in a verdict in favor of Hewitt in the amount of $25,000; the trial court entered judgment on the verdict.

The City argues on appeal that the trial court erred in ruling that Hewitt was an invitee and in refusing the City's proffered instructions which were based on the theory that Hewitt had exceeded the scope of her invitation, had become a bare licensee or trespasser, and was thus not entitled to the degree of care owed to an invitee. The City further contends, as it did at trial, that there is no evidence that the City was negligent and that the evidence shows as a matter of law that Hewitt's injuries were caused by her negligence in failing to maintain a proper lookout.

After Hewitt's evidence had been presented and the City's motion to strike had been denied, the City introduced evidence, thereby waiving its earlier motion. In accordance with established principles, therefore, we will consider all the relevant evidence. *Hargraves* v. *Commonwealth,* 219 Va. 604, 248 S.E.2d 814 (1978).

On January 2, 1979, Hewitt telephoned what was locally known as the V.P.I. Extension Service office to inquire about obtaining part-time employment. An employee told her she could pick up an application the next morning. The office was in an old brick office building owned by the City and located at the intersection of North Main Street and Constance Road in Suffolk. Hewitt, then 58 years of age, parked in the parking lot on the north side of the building between 10:00 a.m. and 11:00 a.m. on January 3, which she described as a "bright, shiny day, and cold." At that time, she saw two men she believed to be dressed in business suits enter a back door of the building.

Leaving her husband in the car, Hewitt walked up the steps from the parking lot and entered the first door on the north side of

the building; inside were signs "saying Domestic Court and juvenile something." Realizing that she had entered the wrong door, she withdrew and followed the sidewalk around the back of the building to the next door, which was the same one she had seen the two men enter. This door, she said, was wooden, contained no windows or signs, and appeared "just like the other white door." Hewitt testified, "I opened the door, and it opened to the inside, and I stepped in, and that's it." She continued, "I blacked out and fell." Hewitt said the first step was a "long step." She remembered seeing only a light bulb before she fell down a flight of steps and broke her leg. Other evidence established that the steps led down to the floor of the boiler room where two men were working.

A photograph introduced in evidence by the City showed at the front of the building the main entrance and a sign for the Extension Service office. Asked why she did not go to the front entrance initially, Hewitt explained that when she walked up the steps from the parking lot, "there was no sidewalk going around to the front of the building." A sketch drawn by Thomas Hines, the City's Director of Public Works, tended to support Hewitt's explanation by showing no sidewalk leading from the parking lot to the front entrance. Hewitt acknowledged that she could have gone to the main entrance but said she did not think about doing so after she had seen the two men go in the back.

Hines's sketch of the building showed that the rear sidewalk led first to the juvenile court office on the north side, then to the boiler room on the east end, and then to an Extension Service conference room around the corner. Hines said the other doors were in better condition than the boiler room door, which, however, he said was not dilapidated. Acknowledging that the boiler room door on January 3, 1979, was a plain white wooden door, Hines confirmed that there were no signs on the door or the building identifying the entrance or warning the public not to enter. Hines said the boiler room door was ordinarily kept locked but he and an assistant had entered the room about 9:15 or 9:30 a.m. on January 3 in response to a report of a heating malfunction and did not lock the door after they entered because they were "servicing the unit."

Hines testified there was a six-inch step down from a four-inch wide concrete threshold which supported the door. He estimated the overall drop from the entrance to the level of the furnace to be approximately five feet. The boiler room was illuminated by a sin-

gle 150-watt incandescent bulb hanging about three feet above the eye level of a person entering the door.

Hines said he and his assistant were at the bottom of the "stair tread, approximately six steps down into this boiler pit, bending over the fire unit that services the boiler," when he was distracted by "the brightness of the door being opened." He looked around and "saw a figure begin to tumble down the steps." He had no time to say anything to Hewitt as she entered the door but he cushioned her fall and rendered assistance.

On a photograph, Hines identified as a coal chute a black rectangular fixture imbedded in the wall near the boiler room door. Hewitt had previously denied seeing this fixture because it was on the section of wall beyond the door and outside her view as she approached from the other side.

The City argues that it was entitled to have instructions granted that would have either required or permitted the jury to find that Hewitt exceeded the scope of her invitation to use the premises and became a bare licensee or a trespasser when she entered the boiler room. In our consideration of this question, of course, we review the evidence in the light most favorable to the City to determine whether the evidence required the giving of the proffered instructions, or any of them.

The City relies upon the principle enunciated in *Agricultural Ass'n* v. *LeCato,* 151 Va. 614, 619, 144 S.E. 713, 714 (1928), and approved in *Knight* v. *Moore,* 179 Va. 139, 146, 18 S.E.2d 266, 269-70 (1942), that the duty of a property owner to an invitee is coextensive with and limited by the invitation. Hewitt was not invited to enter the boiler room, says the City, and her status as an invitee, therefore, terminated when she went in the door. This argument, however, fails to recognize that the scope of the invitation depends not only upon the place to which the City intended or believed that Hewitt might go, but also upon the areas to which she was impliedly invited to go by the appearance and condition of the property. As we said in *Knight,* the owner's duty "does not extend to places beyond the invitation and to which the invitee is not reasonably expected to go." 179 Va. at 146, 18 S.E.2d at 270. Conversely, Hewitt remained an invitee if she could be reasonably expected to go in the boiler room door.

In *LeCato,* we held that the plaintiff not only was invited to enter a fairground but also that "[b]y the placing of seats around . . . [a] tree [near a racetrack], he was specifically invited to

make use of a seat so provided . . . ." 151 Va. at 619, 144 S.E. at 714. In *Raylass Chain Stores* v. *DeJarnette,* 163 Va. 938, 941-43, 178 S.E. 34, 34-35 (1935), we held that a customer at a retail store who stepped through an open entrance leading to a landing, which was the same dark color as the main floor but six inches lower, and fell down a stairway remained an invitee even though the stairway was located at the rear of the store and led to a basement used only for storage purposes.

The City's reliance on *Smith* v. *Wiley-Hall Motors,* 184 Va. 49, 34 S.E.2d 233 (1945), in support of its argument that Hewitt's invitee status ceased when she entered the boiler room, is misplaced. In *Smith,* the plaintiff entered the reception room of a gas station late at night, entered another door in looking for the bathroom, ascertained that it was too dark for him to discern any objects, groped unsuccessfully along a wall for a light switch, and then stepped forward, stumbled against something, and fell into the grease pit. He had passed close by an attendant on his way into the station but had asked for no directions. We held that the plaintiff was negligent and that his negligence was the sole proximate cause of the accident. The opinion went further, in dictum, to state that the plaintiff's status as an invitee did not extend so far as to include "a reconnoiter which would take one to the grease pit . . . ." *Id.* at 53, 34 S.E.2d at 234. *Smith* must be limited to its peculiar facts insofar as it relates to an invitee exceeding the scope of his invitation.

The present case is quite different from *Smith.* There is no evidence that Hewitt was ever in close proximity to a City employee before she fell. Unlike the plaintiff in *Smith,* she had just entered a similar door which she discovered was, in fact, a public entrance. The sidewalk appeared to be provided by the City to facilitate public access and egress to and from the doors to which it led. Moreover, there is evidence that Hewitt's entry and fall were nearly simultaneous; in *Smith,* the plaintiff proceeded further even after the circumstances advised caution and no longer presented an appearance inducing his continued progress or impliedly inviting that conduct.

*Raven Red Ash Coal Co.* v. *Griffith,* 181 Va. 911, 27 S.E.2d 360 (1943), also cited by the City, is readily distinguishable from this case. In *Griffith,* the plaintiff, a coal miner, had crawled away from his work site a distance of more than 100 feet along a restricted passageway which was only 30 inches high at the point

where he was killed by an explosion. There is no evidence here that Hewitt proceeded in any direction which she knew led away from the place where she had business to transact.

In this case, the course of the sidewalk, which led from the parking lot not only to the boiler room but also to offices on one side of it and a conference room beyond, the similarity in the appearances of the boiler room door and the first door opened by Hewitt which did provide public access to offices, and the entrance into the middle door by the City's own employees, who were not readily identifiable as workmen, all suggested that the boiler room door was available for use by the public. That an invitee could be reasonably expected to go through this door in search of a governmental office is also evidenced by the City's policy of keeping it locked. Although the City undoubtedly did not intend for Hewitt to enter the boiler room, she acted upon an invitation implied by the circumstances and, therefore, she remained an invitee. We hold that the trial court properly refused the City's proffered instructions which were based on the theory that her status changed.

In considering the questions as to negligence of the City and contributory negligence of Hewitt, we review the evidence in the light most favorable to Hewitt, the prevailing party in the trial court. Thus examined, we reject the City's contention that there was no evidence from which the jury reasonably could infer that the City was negligent and that such negligence proximately caused Hewitt's injuries. An owner is required to give notice or warning of an unsafe condition known to him and unknown to his invitee unless the dangerous condition is open and obvious to a reasonable person exercising ordinary care. *Knight* v. *Moore,* 179 Va. at 146, 18 S.E.2d at 269-70. An invitee may assume that the premises are reasonably safe for his visit. *Id.*

The jury reasonably could infer that the City was negligent in failing to identify the boiler room by posting or painting an appropriate sign to indicate that the public should not enter. Likewise, the jury reasonably could find negligence on the part of the City in failing to keep the door locked while the City employees worked on the furnace. On brief, the City contends that it took every reasonable precaution by keeping the door locked. Indeed, the evidence shows that the door was regularly kept locked, which suggests that the City was aware that this precautionary procedure was required to prevent the public from entering. There is no

evidence that the presence of City employees in the boiler room made it any less important to keep the public from entering at that time. Hewitt saw two men enter the door which the evidence shows remained unlocked when moments later she approached and also opened it. The jury could reasonably find that the City was negligent in not continuing, without interruption, its policy of locking the boiler room door.

*Williamsburg Shop* v. *Weeks,* 201 Va. 244, 110 S.E.2d 189 (1959), upon which the City relies, is distinguishable. In that case, an invitee fell as she descended a stairway in a store. The plaintiff was aware of the steps and did not fall until she had come down one flight of stairs and had begun to turn on a landing. There was no evidence of trash or debris on the stairway or any other negligence on the part of the store. The plaintiff herself told the store manager after the accident that the cause of her fall was that she had tripped on her heel, and this statement was not denied. We held that she had failed to carry her burden of showing actionable negligence on the part of the store and, therefore, that the verdict in her favor was without evidence to support it. In the present case, as we have demonstrated, there is ample evidence of negligence by the City which proximately caused Hewitt's fall.

The only remaining issue is whether Hewitt was contributorily negligent as a matter of law in failing to maintain a proper lookout and is thereby barred from recovery. Ordinarily, contributory negligence, like primary negligence, is a jury question. We hold that the evidence in this case falls within this general rule and that the issue of contributory negligence was properly submitted to the jury.

In *Mary W. Crocker* v. *WTAR Radio Corp.,* 194 Va. 572, 74 S.E.2d 51 (1953), Crocker, an invitee participating in a fashion show, fell as she walked onto a two-level stage. She looked at the floor as she stepped down but failed to discern the four-to-six-inch drop between the different levels. There was evidence that there was no special marking on the floor to indicate the step, both levels were of highly polished oak of the same color, and several bright overhead lights shone directly on the floor. Crocker said she was given no warning of the danger. The trial court ruled that she was contributorily negligent as a matter of law. We reversed, holding that the evidence of high polish on the floor, the perfectly matched appearance of the two levels, the bright overhead lights, and the fact that the change in level for the plaintiff was down-

ward were circumstances warranting the inference that Crocker was not contributorily negligent. A jury issue, therefore, was raised.

■ The City says that Hewitt must be held contributorily negligent because she did not testify, as the plaintiff in *Crocker* did, that she looked down but failed to perceive the step. We refuse to hold as a matter of law, however, that a plaintiff's failure to look down while stepping forward must constitute contributory negligence in every case.

In *DeJarnette,* the defendant's argument that contributory negligence was established was "based in a great measure on the alleged admission of plaintiff 'that she did not look to see where she was going when she stepped backward or sideways from the main floor level to the landing.' " 163 Va. at 944, 178 S.E. at 36. Citing *LeCato,* we rejected this contention and said that the plaintiff "had a right to rely on the legal discharge by the defendant of the duty it owed her as an invitee." *Id.* at 947, 178 S.E. at 37. Applying these principles again in *Knight* v. *Moore,* we held that "[i]n the absence of knowledge or warning of danger, . . . [an invitee] is not required to be on the lookout for it." 179 Va. at 146, 18 S.E.2d at 270.

Although Hewitt failed to look down before stepping forward, other facts not present in *Crocker* allowed the jury reasonably to find that Hewitt was not contributorily negligent. Unlike *Crocker,* where the dropoff was located on an open, brightly lit stage on which the plaintiff had already taken at least two steps, Hewitt encountered a six-inch dropoff located immediately inside the door as she stepped from bright daylight into a dimly lit room. The closed door concealed the hazard faced by Hewitt until she simultaneously opened the door and entered. Thus, the feature relied upon by the City, Hewitt's failure to look down as she stepped forward, is but one of many facts to be considered and is not controlling.

The City further argues that one who opens a closed door must verify the existence of safe footing on the other side before stepping over the threshold. We acknowledge that where a plaintiff is injured when he fails to see a dangerous condition that is open and obvious he is contributorily negligent as a matter of law. Thus, in *Presbyterian School* v. *Clark,* 205 Va. 153, 135 S.E.2d 832 (1964), on which the City relies, we held that a plaintiff who, as she left an office building, had a direct and unobstructed view of

the doorway through which she had previously entered but walked into a plate glass panel adjacent to the entrance doors was guilty of contributory negligence as a matter of law. The evidence in the present case, however, does not show conclusively that the dangerous condition was open and obvious to Hewitt as she opened the door. It was a jury question whether Hewitt exercised reasonable care for her own safety under the circumstances.

We agree with the decisions of the many jurisdictions which have held that an invitee who mistakenly enters a doorway which appears to but does not provide access to the business area he intends to enter is not contributorily negligent as a matter of law if there was no indication, by sign or otherwise, that the door was not for public use. *See, e.g., Trimble* v. *Spears,* 182 Kan. 406, 320 P.2d 1029 (1958); *Happy* v. *Walz,* 358 Mo. 56, 213 S.W.2d 410 (1948); *Downing* v. *Merchants Nat. Bank,* 192 Iowa 1250, 184 N.W. 722 (1921); *Foren* v. *Rodick,* 90 Me. 276, 38 A. 175 (1897); *Clopp* v. *Mear,* 134 Pa. 203, 19 A. 504 (1890). *See also Tie Bar, Inc.* v. *Shartzer,* 249 Md. 711, 241 A.2d 582 (1968); *McAdams* v. *Raymond S. Roberts, Inc.,* 117 Vt. 309, 91 A.2d 706 (1952); *Falk* v. *Chicago & N.W. Ry. Co.,* 133 Minn. 41, 157 N.W. 904 (1916); Annot., 42 A.L.R. 1098 (1926); Annot., 20 A.L.R. 1147 (1922).

The boiler room door resembled the other door that Hewitt had just entered and then exited. There was no sign identifying it as a door not open to public use. It was not locked. Two men in business suits had entered the door before Hewitt approached it. The sidewalk on the north side of the building led not to the front entrance but to the boiler room door. There was virtually no threshold at the boiler room entrance; after a threshold of not more than four inches supporting the door there was a six-inch drop to the top step. The door opened inward so that the view of one entering might be at least partially obscured. Hewitt's evidence was that she opened the door, put her foot down, "blacked out," and tumbled down the steps. We hold that the jury reasonably could infer the dangerous condition inside the door was not open and obvious to Hewitt either before or as she stepped across the threshold and that the trial court did not err in submitting the issue of her contributory negligence to the jury.

For the reasons set forth herein, we will affirm the judgment of the trial court.

*Affirmed.*